2006 UT 40

**AMERICAN BUSH, a Utah corporation; Jerry Phelps, dba Paradise Modeling; Brent E. Reid, dba All for Love; Gayle Petersen, dba Leather and Lace, Plaintiffs and Appellants,**

v.

**CITY OF SOUTH SALT LAKE, a municipal corporation, Defendant and Appellee.**

No. 20020117.

Supreme Court of Utah.

July 28, 2006.

See also 42 Fed.Appx. 308, 2002 WL 1443474.

W. Andrew McCullough, Trenton K. Ricks, Midvale, for plaintiffs.

Janice L. Frost, David M. Carlson, South Salt Lake, and Scott D. Bergthold, Chattanooga, Tennessee, for defendant.

PARRISH, Justice:

¶ 1 Plaintiffs American Bush, Jerry Phelps,[1] Brent E. Reid, and Gayle Petersen

---

1. Jerry Nielsen, dba Paradise Modeling, was one of the original plaintiffs in this case. By motion dated May 22 and granted May 23, 2002, Jerry

(collectively, the "Businesses") appeal the district court's denial of their motion for summary judgment and grant of summary judgment to the City of South Salt Lake ("South Salt Lake" or the "City") on the Businesses' claim that the Utah Constitution protects nude dancing. We hold that the provisions of the Utah Constitution that guarantee Utah citizens' rights to "communicate freely their thoughts and opinions" do not extend protection to nude dancing in sexually oriented businesses. We accordingly affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Plaintiffs American Bush, Jerry Phelps, dba Paradise Modeling, and Gayle Petersen, dba Leather and Lace, operate nude dancing establishments located in South Salt Lake. Plaintiff Brent E. Reid owns a lingerie and novelty store, also situated in South Salt Lake. In May 2001, the South Salt Lake City Council adopted a new sexually oriented business ordinance that repealed and replaced all previous ordinances of this type. Section 5.56.310(G) of the new ordinance specifically prohibits any sexually oriented business employee from "[a]ppear[ing] in a state of nudity before a patron on the premises of a sexually oriented business." This language, which had not appeared in previous versions of the City's sexually oriented business ordinance, effectively eliminates the former subcategory of "nude dancing establishments" and requires three of the four businesses—American Bush, Paradise Modeling, and Leather and Lace—to either reapply for business licenses as semi-nude dancing establishments or face civil and criminal sanctions for violation of the new ordinance.

¶ 3 Originally, the Businesses filed an action in district court, claiming, among other things, that article I, section 15 of the Utah

Constitution confers greater protection on expression than does the United States Constitution, rendering the City's ordinance prohibiting nude dancing a violation of state free speech rights. The City responded by removing the suit to federal district court, and the Businesses countered by amending their complaint before the City filed its answer, to delete all federal constitutional claims from the suit. The federal district court then dismissed all federal claims with prejudice but allowed the Businesses to refile their state constitutional challenges in state court.

¶ 4 After refiling in state court, the Businesses twice moved for temporary injunctions restraining the City from enforcing the ordinance. The motions were denied. The Businesses then moved for summary judgment, and the City responded with its own summary judgment motion. The district court denied the Businesses' motion and granted South Salt Lake's. The Businesses now appeal.

## ANALYSIS

¶ 5 The Businesses present us with a question of Utah constitutional interpretation. Each of the businesses is, or has an interest in, a business offering nude dancing as part of an adult, sexually oriented business located in South Salt Lake City. The City has enacted various business license and zoning restrictions on sexually oriented businesses. The Businesses see these enactments as restrictions on their right of free expression through nude dancing and believe the restrictions are, or should be, prohibited under the Utah Constitution.

¶ 6 Specifically, the Businesses claim that article I, sections 1 and 15 of the Utah Constitution confer greater protection to expression through nude dancing than the United States Constitution.[2] As such, they claim that the city ordinance prohibiting nude

---

Phelps, dba Paradise Modeling, was substituted for the deceased Jerry Nielsen.

**2.** Federal courts have held that the imposition of a requirement for minimal dress on dancers in sexually oriented businesses poses at most a de minimis effect on any free speech rights involved under the United States Constitution. *See, e.g.,*

*Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1196 (10th Cir.2003) (citing *City of Erie v. Pap's A.M.,* 529 U.S. 277, 294, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)). Plaintiffs in this case, however, have deliberately excluded any claims under the United States Constitution from being considered in this action.

dancing in South Salt Lake violates the free speech rights of the Businesses under the Utah Constitution. As subsidiary issues, the Businesses also claim that the institution of a new city ordinance banning nude dancing in sexually oriented businesses constitutes a "taking" in violation of article I, section 7 of the Utah Constitution, that the City is without legal authority to enact such an ordinance, and that as to plaintiff Brent Reid, the summary judgment entered in the City's favor by the district court was improper. In reviewing the judgment of the district court, we will analyze each of these claims in turn.

## I. PLAINTIFFS' FREE SPEECH CLAIM

¶ 7 Plaintiffs have produced little direct authority for the proposition that the Utah Constitution protects nude dancing. However, this is due primarily to the poverty of both Utah case law and scholarly analysis of the history and meaning of the freedom of speech provisions of the Utah Constitution. In light of this court's support of the primacy model, which analyzes issues under the state constitution before resorting to the federal constitution, *West v. Thomson Newspapers*, 872 P.2d 999, 1004–07 (Utah 1994), we take this opportunity to elucidate the constitutional underpinnings of our holding that the Utah Constitution does not protect nude dancing from the reach of the South Salt Lake City ordinance at issue here. The issue was fairly raised by plaintiffs, and our attention to this matter may serve to clarify the state of the law in this area.

¶ 8 The question before us is whether a South Salt Lake ordinance banning nude dancing in sexually oriented businesses violates the Utah Constitution. The first step in our analysis must be to determine whether nude dancing is a protected right under the freedom of speech clauses of the Utah Constitution. If it is a protected right, we then must determine whether the ordinance impermissibly abridges or restrains this right. As this court has not yet addressed these questions, this case is one of first impression.

### A. Interpretative Framework

¶ 9 Although this court has not addressed whether the Utah Constitution protects nude dancing, prior cases provide guidance on how the freedom of speech provisions of the Utah Constitution should be interpreted. The scope of Utah's constitutional protections "may be broader or narrower than" those offered by the First Amendment, "depending on [our] state constitution's language, history, and interpretation." *West*, 872 P.2d at 1004 n. 4.

¶ 10 The interpretation of the protections afforded by the Utah Constitution appropriately commences with a review of the constitutional text. *Grand County v. Emery County*, 2002 UT 57, ¶ 29, 52 P.3d 1148 (explaining that "our starting point in interpreting a constitutional provision is the textual language itself"). While we first look to the text's plain meaning, *State v. Willis*, 2004 UT 93, ¶ 4, 100 P.3d 1218, we recognize that constitutional "language . . . is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them." *Dennis v. United States*, 341 U.S. 494, 523, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). We thus inform our textual interpretation with historical evidence of the framers' intent. *State v. Betensen*, 14 Utah 2d 121, 378 P.2d 669, 669–70 (1963) ("[I]t is proper to look not only to the [constitution] itself, but to the background out of which it arose and its practical application in order to determine the [framers'] intent."); *see also Univ. of Utah v. Bd. of Exam'rs*, 4 Utah 2d 408, 295 P.2d 348, 361–62 (1956) ("[I]f the words are ambiguous or their meaning not clear, then it is proper to look outside the instrument itself to ascertain what the framers meant by the language used.").

¶ 11 In reviewing the history of Utah constitutional provisions protecting the freedom of speech, "we [have] look[ed] for guidance to the common law, our state's particular . . . traditions, and the intent of our constitution's drafters." *West*, 872 P.2d at 1013. We also have looked to court decisions made contemporaneously to the framing of Utah's constitution in sister states with similar free

speech constitutional provisions. *KUTV, Inc. v. Conder,* 668 P.2d 513, 518–21 (Utah 1983). In light of the fact that the Utah Constitution was "adopted ... against the background of over a century of experience under the United States Constitution," an understanding of the First Amendment contemporary to its adoption is also instructive. *Id.* at 521.

¶ 12 In summary, in interpreting the Utah Constitution, prior case law guides us to analyze its text, historical evidence of the state of the law when it was drafted, and Utah's particular traditions at the time of drafting.[3] The goal of this analysis is to discern the intent and purpose of both the drafters of our constitution and, more importantly, the citizens who voted it into effect.[4] It is from this latter class of individuals that the Utah Constitution derives its power and effect, and it is to them we must look for its proper interpretation.

¶ 13 The framers of Utah's constitution saw the will of the people as the source of constitutional limitations upon our state government. On the floor of the Utah constitutional convention, Charles Varian quoted from a treatise written by Thomas Cooley, the preeminent authority of the late nineteenth century on state constitutional matters, which reads as follows:

> In considering State constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. ... [A state constitution] is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought. There is nothing primitive in it: it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny.

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 36–37 (Leonard W. Levy ed., Da Capo Press 1972) (1868) [hereinafter Cooley, *Constitutional Limitations* ], *quoted in* 1 Official Report of the Proceedings and Debates of the Convention 643 (Salt Lake City, Star Printing Co. 1898) [hereinafter *Proceedings* ]. Thus, as the rights which are protected by the Utah Constitution are "based upon the pre-existing condition of laws, rights, habits, and modes of thought" then extant, *id.,* it is

---

**3.** We have intentionally excluded the consideration of policy arguments suggested by *Society of Separationists v. Whitehead,* 870 P.2d 916, 921 n. 6 (Utah 1993). As is the case with statutory interpretation, our duty is not to judge the wisdom of the people of Utah in granting or withholding constitutional protections but, rather, is confined to accurately discerning their intent. *Volker–Scowcroft Lumber Co. v. Vance;* 32 Utah 74, 88 P. 896, 899 (1907) ("With the wisdom or equity of such a [constitutional] provision neither we nor the Legislature [has] anything to do."). Policy arguments are relevant only to the extent they bear upon the discernment of that intent.

**4.** Federal courts have recognized a similar obligation when interpreting the United States Constitution. *See, e.g., Bell v. Maryland,* 378 U.S. 226, 288–89, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (Goldberg, J., concurring) ("Our sworn duty to construe the Constitution requires, however, that we read it to effectuate the intent and purposes of the Framers. We must, therefore, consider the history and circumstances indicating what the [constitutional provisions] were in fact designed to achieve."); *Lake County v. Rollins,* 130 U.S. 662, 671, 9 S.Ct. 651, 32 L.Ed. 1060 (1889) ("The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption."); *Tom v. Sutton,* 533 F.2d 1101, 1105 (9th Cir.1976) ("In interpreting a constitutional provision, the fundamental principle of construction is to give the provision the effect intended by the framers and the people adopting it.").

to these sources that we must look to determine the proper scope of the freedom of speech.

¶ 14 Through the process of voting for the constitution on November 5, 1895, the citizens of Utah circumscribed the limits beyond which their elected officials may not tread.[5] As "[a]ll political power is inherent in the people," Utah Const. art. I, § 2, only Utah's citizens themselves had the right to limit their own sovereign power to act through their elected officials. Judicial officers may not substitute their own wisdom for that of the people of Utah inasmuch as the citizens limited the actions of their elected officials in certain areas but left them free in other areas to exercise their judgment in representing their constituents. To do so would be to deny political powers to the citizens of Utah that they in their wisdom and judgment had retained for themselves.

¶ 15 It is now our preliminary task to discern if the people of Utah intended to bind the hands of their duly elected officials by protecting nude dancing under the free speech clauses of their constitution. We first examine the text of the freedom of speech clauses in our constitution. We then examine the historical roots of the language of our constitution. Finally, we examine the historical context of the society which adopted our freedom of speech clauses in order to divine the intent of our citizens in choosing the language.

### B. The Text of the Freedom of Speech Provisions of the Utah Constitution

¶ 16 We begin our analysis with the constitutional text itself. The language of our constitution contains the surest indication of the intent of its framers and the citizens of Utah who voted it into effect. Article I, section 1 declares, in relevant part, that "[a]ll men have the inherent and inalienable right ... to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1. Addi-

tionally, article I, section 15 provides as follows:

> No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*Id.* art. I, § 15.

¶ 17 The framers of the Utah Constitution divided the freedom of speech guarantees into three distinct clauses. The first clause (the "liberty and responsibility clause"), contained in section 1 of the declaration of rights, defines the scope of the freedom of speech. *Id.* art. I, § 1. The second clause (the "governmental restriction clause"), contained in the first sentence of section 15, prohibits governmental actions that abridge or restrain those rights. *Id.* art. I, § 15. These first two clauses of general application function in concert; the first defines what is protected, while the second defines the limits of governmental action in relation to those protected activities. The third clause (the "criminal libel clause"), contained in the second sentence of section 15, illustrates the limits of governmental action, and by inference the scope of individual freedoms, in the specific instance of criminal libel prosecutions. *Id.*

¶ 18 We pause to note that we disagree with Justice Nehring's contention that article I, section 1 and article I, section 15 are not complementary and should not be read together. Such an interpretative approach defies conventional methods of constitutional interpretation, which dictate that when determining the meaning of a constitutional provision, "other provisions dealing generally with the same topic ... assist us in arriving at a proper interpretation of the constitutional provision in question." *In re Worthen*, 926 P.2d 853, 866–67 (Utah 1996);

---

**5.** "By the constitutions which they form, [the people] tie up alike their own hands and the hands of their agencies; and neither the officers of the State, nor the whole people as an aggregate body, are at liberty to take action in opposition to these fundamental laws." Cooley, *Constitutional Limitations, supra* ¶ 13, at 28.

see also Berry v. Beech Aircraft Corp., 717 P.2d 670, 675 (Utah 1985) (indicating that the meaning of a constitutional provision "must be taken not only from its history and plain language, but also from its functional relationship to other constitutional provisions"); State ex rel. Breeden v. Lewis, 26 Utah 120, 72 P. 388, 389 (1903) (indicating that when constitutional provisions "are in pari materia, ... under well-known rules of interpretation, [they] must be construed together"). Since article I, section 1 and article I, section 15 are both directed toward expression, it is entirely appropriate, in fact necessary, that we construe these two provisions together. Indeed, this court has specifically held that "article I, section 15 must be read in conjunction with other constitutional provisions ... [including] [t]he opening provision of the Utah Constitution." West, 872 P.2d at 1015 (emphasis added); see also Redding v. Brady, 606 P.2d 1193, 1196 (Utah 1980) (construing article I, section 1 and article I, section 15 in concert).

¶ 19 Justice Nehring suggests that these two provisions should not be read together because they have "distinct historical lineages." Infra ¶ 158. As is ably articulated by Justice Durrant in his concurring opinion, however, the distinction urged by Justice Nehring is not entirely clear. Infra ¶ 102. And we are convinced that although article I, section 1 may have some natural law underpinnings, its language is clearly tempered by the Blackstonian-inspired phrase "being responsible for the abuse of that right." See discussion infra ¶¶ 102–05. Consequently, Justice Nehring's interpretation does not convince us that we should abandon the well-accepted approach of reading like provisions together.

¶ 20 Having concluded that these two provisions should be read in concert, we now must determine whether the interplay of these provisions protects nude dancing under the Utah Constitution. In analyzing this question, we deem the liberty and responsibility clause to be directly applicable because it defines the character of those activities that are protected. The criminal libel clause is also instructive, as it provides a specific example of the extent of those freedoms.

The governmental restriction clause, however, is not applicable in this initial analysis because it does not expand upon the rights contained in the liberty and responsibility clause but merely restrains governmental action in relation to those established rights; no additional rights are secured by the former than are contained in the latter. Other states with similar constructions have interpreted their freedom of expression clauses similarly. See Ex parte Tucci, 859 S.W.2d 1, 23 (Tex.1993) (Phillips, C.J., concurring) ("[N]o Texas case has yet suggested that the second [governmental restriction] clause imparts protection greater than either the 'liberty and responsibility' clause or the First Amendment, or that it modifies the state's ability to impose punishment for expressions deemed an 'abuse.' "); Jacobs v. Major, 139 Wis.2d 492, 407 N.W.2d 832, 837 (1987) ("The two independent clauses [of article I, section 3] are neither verbose nor repetitious in expressing the idea of the section. They are related to each other with the first expressing the right to free speech and the second stating the entity, the state, against whom the right is shielded.").

¶ 21 While it is true that the governmental restriction clause contained in article I, section 15 of the Utah Constitution is broader than its federal counterpart, this does not expand the range of expression protected, as Chief Justice Durham's dissent seems to imply. See infra ¶ 113. Rather, it narrows the scope of permissible governmental action in relation to forms of expression protected by the liberty and responsibility clause of article I, section 1. Chief Justice Durham cites a footnote in Provo City Corp. v. Willden, 768 P.2d 455 (Utah 1989), infra ¶ 116 n. 10, in which we stated that article I, section 15 of the Utah Constitution, "by its terms, is somewhat broader than the federal clause." 768 P.2d at 456 n. 2. Indeed, the Utah Constitution forbids laws which either "abridge or restrain the freedom of speech," Utah Const. art. I, § 15 (emphasis added), while the United States Constitution forbids only those laws that "abridg[e]" that right. U.S. Const. amend. I. Thus, the language of the Utah Constitution seems to prohibit laws which either directly limit protected rights or indirectly inhibit the exercise of those rights.

This clause, however, does not define what those rights are.

¶ 22 Instead, we must turn to the text of the liberty and responsibility clause to determine what these rights are. The Utah Constitution explicitly defines the freedom of speech right in article I, section 1 as the right to "communicate freely ... thoughts and opinions, being responsible for the abuse of that right." In interpreting this clause, Chief Justice Durham focuses on the word "communicate." *Infra* ¶ 116. Purporting to use a plain language analysis, Chief Justice Durham asserts that since nude dancing is communicative, it is therefore communication. *See* discussion *infra* ¶¶ 116–23. Such an interpretation is problematic, however, because it does not make a distinction between communicative acts and communication. It assumes that because nude dancing is communicative, it is constitutionally protected unless it qualifies as an abuse of the right to communicate. But this interpretation is overly broad because it does not examine the meaning of "communicate" within the context of a constitution. It attempts to suggest that the term "communicate" has a single, objective meaning that can be read in isolation. This is not the case. "A text's meaning cannot be separated from its speaker, its audience, its genre—from its context." *Laney v. Fairview City,* 2002 UT 79, ¶ 32, 57 P.3d 1007 (internal quotation marks and brackets omitted).

¶ 23 In using history as context to illuminate the text's meaning, we recognize that the Utah Constitution is not a patchwork of "barren words found in a dictionary." *Dennis v. United States,* 341 U.S. 494, 523, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). Instead, it is the "original and supreme will" of the citizenry, and "a superior, paramount law" that fixes the boundaries of power granted to the branches of state government, including this court. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176–77, 2 L.Ed. 60 (1803). If these boundaries can be shifted by "those

intended to be restrained," then "[t]he distinction[ ] between a government with limited and unlimited powers[ ] is abolished." *Id.* We must therefore consider the text in its historical context in order to discern if the constitution's framers intended to limit the government's power to regulate nude dancing. *See In re Inquiry Concerning a Judge,* 1999 UT 6, ¶ 15, 976 P.2d 581 (explaining that "this court has a very long history of interpreting constitutional provisions in light of their historical background and the then-contemporary understanding of what they were to accomplish"); *see also Spence v. Utah State Agr. Coll.,* 119 Utah 104, 225 P.2d 18, 23 (1950) ("We are restricted to this definition because of another canon of constitutional construction that terms used in a constitution must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted." (citation omitted)).

¶ 24 Indeed, Chief Justice Durham herself has previously recognized the importance of evaluating constitutional text within a historical framework, stating that "[c]onstitutional language *must be viewed in context,* meaning that its history and purpose *must* be considered in determining its meaning." *Laney,* 2002 UT 79, ¶ 37, 57 P.3d 1007 (emphasis added). In light of this recognition, it is puzzling why she believes it is inappropriate to examine historical evidence of the framers' intent.

¶ 25 Therefore, with a historical context in mind, we return to the text of the liberty and responsibility clause. On its face, the freedom of speech defined in the Utah Constitution is a circumscribed right. The freedom to communicate thoughts and opinions is limited by the caveat that abuses of the right may be punished. *West,* 872 P.2d at 1015. The term "abuse of that right" specifically constrains the scope of the communication right, and any textual interpretation must consider how this phrase functions within the liberty and responsibility clause.[6]

---

6. Although we do recognize that Chief Justice Durham addresses the "abuse of that right" language, *infra* ¶ 124, she fails to do so until after she has examined the term "communicate," *infra*

¶ 116. Indeed, Chief Justice Durham appears to reach the result that nude dancing is protected communication before even examining this "abuse" language. *See infra* ¶¶ 116–23.

¶ 26 The question then becomes, "What constitutes an abuse of this right?" This court has noted that "some historical evidence suggests that [the phrase 'responsible for the abuse'] was intended to preserve liability for defamation." *Id.; see also* 1 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* § 5–2(c)(5) (3d ed.2000). While this is undoubtedly true, there is. no evidence that the framers intended to limit the abuses that may be regulated to defamation suits. The framers chose to use the broad phrase "abuse of that right" rather than language specifically tailored to suits for libel and defamation. We must assume that they did so in order to preserve a broader definition of what constitutes an abuse.

¶ 27 The only textual evidence for what this phrase means can be found in the criminal libel clause in the second sentence of article I, section 15. In this clause, we see that it may be an abuse of free speech to print a statement libelous to government interests, even if that statement happens to be completely true. Under that clause, an individual may use the truth as a defense in suits for criminal libel only if the statements were "published with good motives, and for justifiable ends." Utah Const. art. I, § 15.

¶ 28 The United States Supreme Court, however, has explicitly rejected the "good motives" and "justifiable ends" requirements under the First Amendment to the United States Constitution. *See Garrison v. Louisiana*, 379 U.S. 64, 70–73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *see also I.M.L. v. State*, 2002 UT 110, ¶ 23, 61 P.3d 1038. Under the United States Constitution, therefore, the truth may be used as a defense in criminal libel cases regardless of the motives for the offending statement's utterance. *See Garrison*, 379 U.S. at 73, 85 S.Ct. 209. Thus, the

plain language of the Utah Constitution provides less protection in this area than the First Amendment.[7] The criminal libel clause, therefore, clearly demonstrates that the Utah Constitution provides, not absolute, but limited protection for the expression of ideas and opinions. Under its terms, even the articulation of truthful yet libelous ideas is constrained by the requirement that they be expressed, not out of malice, but for a socially beneficial end.

¶ 29 Thus, from the text of the Utah Constitution, we see that the clause defining the scope of activities protected by the freedom of speech does not extend to "abuses" of that freedom. We also see that the purely malicious expression of truthful yet libelous statements is one example of what would be considered an abuse of the freedom of speech by our constitution. The plain text of the Utah Constitution, however, does not clearly indicate whether nude dancing is a protected expression of thoughts and ideas, or whether it is an abuse of this right and therefore excepted from constitutional guarantees. In order to determine what would be considered an abuse within the context of the Utah Constitution, we therefore undertake an historical analysis to discern the intent of the citizens of Utah in adopting this limitation on the freedom of speech.

¶ 30 Chief Justice Durham criticizes our approach for the undesirable results it might produce in other cases, specifically pointing to the landmark United States Supreme Court decision of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), as one case where our approach might produce a morally unacceptable result. *Infra* ¶ 135. While we doubt that our approach would mandate unacceptable outcomes in *Brown* and other cases,[8] we do not

---

7. Plaintiffs argue in their brief that, because this court has granted greater protections against search and seizure under the Utah Constitution than the United States Constitution, our constitution naturally provides greater protection to the freedom of speech than does the federal constitution. This appeal to a separate clause in our constitution is unpersuasive in light of the fact that, on its face, the Utah Constitution's freedom of speech provisions specifically accord less pro-

tection than the United States Constitution in the area of criminal libel.

8. Prior to his appointment to the bench, Judge Michael W. McConnell of the United States Court of Appeals for the Tenth Circuit performed an extensive historical analysis of the ratification process of the Fourteenth Amendment in his article *Originalism and the Desegregation Decisions*, 81 Va. L.Rev. 947 (1995). He undertook the task in order to question the assumption

accept the broader contention, suggested by Chief Justice Durham, that outcomes should dictate our approach. Ultimately, our historical approach gives proper deference to the citizenry's exercise of sovereignty and political power in granting limited powers to the state government through the enactment of the Utah Constitution. If the electorate finds certain outcomes dictated by this approach unacceptable, it can again wield its precious political power to counteract the actions of the legislature or, if necessary, amend the offending language of the Utah Constitution. We now use this approach to discern the intent of the framers of the Utah Constitution.

### C. The History of the Freedom of Speech Provisions at the Time of Utah's Constitutional Convention

¶ 31 The drafters of the Utah Constitution borrowed heavily from other state constitutions and the United States Constitution. Therefore, tracing the genealogy of Utah's freedom of speech clauses to their progenitors sheds light on the framers' intent in adopting particular provisions. The following discussion illustrates that Utah's decision to limit the freedom of speech, by holding citizens responsible for the abuse of that right, finds its roots in the English common law.

¶ 32 At the time of our nation's founding, the idea that the freedom of speech was subject to some limitation found popular expression in the writings of Blackstone. In

this passage from his *Commentaries*, first published between 1765 and 1769, Blackstone famously declares:

> [W]here blasphemous, immoral, treasonable, schismatical, seditious, or scandalous libels are punished by the English law, some with a greater, others with a less degree of severity; the *liberty of the press*, properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity.... Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment.... [T]he press cannot be abused to any bad purpose, without incurring a suitable punishment....

William Blackstone, 4 *Commentaries* \*151–53 (emphasis in original). Thus, the principle of limited freedom of speech in the Utah Constitution has its roots in Blackstone's formulation of the common law, which prohibits prior restraints on publications, but reserves for the state the power to punish publications considered to be an abuse of the liberty of the press, including "immoral" libels.[9]

"that the ahistorical quality of *Brown* was unavoidable, because an historical approach to the question would have produced a morally unacceptable answer." *Id.* at 1140. This is the same assumption suggested by Chief Justice Durham in her dissent. *Infra* ¶¶ 134–35. McConnell's painstaking research and analysis concluded that, contrary to popular belief, "school segregation was understood during Reconstruction to violate the principles of equality of the Fourteenth Amendment."

McConnell found that
[b]etween 1870 and 1875, both houses of Congress voted repeatedly, by large margins, in favor of legislation premised on the theory that de jure segregation of the public schools is unconstitutional. The desegregation bills never became law because, for procedural reasons, a two-thirds majority of the House of Representatives was required for final passage.

Even so, the Reconstruction Congress passed legislation prohibiting segregation of inns, theaters, railroads, and other common carriers, and rejected legislation that would have countenanced segregated education on a separate-but-equal basis. The Court in *Brown* refused to "turn the clock back." But had it done so, it would have discovered strong support for its holding—stronger than the dubious "modern authority" on which the Court relied.
McConnell, *supra* note 10, at 1140.

In McConnell's view, an historical approach would not only have been appropriate in *Brown*, it would have been a "powerful judicial assault on the Jim Crow laws of the South." *Id.* at 955.

9. Blackstone's prohibition of prior restraints is commonly viewed as forbidding the establishment of a governmental body that censored works before they were allowed to be published.

¶ 33 This Blackstonian construction of the freedom of speech, however, was not used in the earliest state constitutions of the revolutionary period. Other voices from England's intellectual tradition initially proved to be more influential on the constitutional law in our emerging nation. Of particular importance were Trenchard and Gordon, who published a series of letters between 1720 and 1723, collectively known as *Cato's Letters,* that argued for more extensive rights of expression without fear of government reprisal. *See Ex parte Tucci,* 859 S.W.2d 1, 65 (Tex. 1993) (Phillips, C.J., concurring). One commentator has even described these essays as " 'the most popular, quotable, esteemed source of political ideas in the colonial period.' " David A. Anderson, *The Origins of the Press Clause,* 30 UCLA L.Rev. 455, 491 (1983) (quoting C. Rossiter, *Seedtime of the Republic* 141 (1953)). Indeed, our nation's earliest notion of the freedom of speech probably "was closer to Cato's than Blackstone's." *Tucci,* 859 S.W.2d at 66 (Phillips, C.J., concurring).

¶ 34 *Cato's Letters* were popular enough in the period leading up to the Revolutionary War that the leading radical newspaper in Massachusetts, the *Boston Gazette,* republished Trenchard and Gordon's essays in 1768. Anderson, *supra* ¶ 33, at 463. The principles espoused in *Cato's Letters* were put to the test later that same year, when the *Boston Gazette* published an article critical of the royal governor, who then asked the colonial legislature to refer the matter to a grand jury for prosecution as seditious libel. *Id.* "The House, dominated by the radical leader Sam Adams, refused to do so and instead adopted a resolution" which drew upon language from *Cato's Letters:* "The Liberty of the Press is a great Bulwark of the Liberty of the People: It is, therefore, the incumbent Duty of those who are constituted the Guardians of the People's Rights to defend and maintain it." *Id.* (internal quotation marks omitted).

¶ 35 As the colonies declared their independence from Great Britain, this bulwark metaphor, taken from Essay No. 15 of *Cato's Letters,* entitled, "Of Freedom of Speech: That the same is inseparable from Publick Liberty," 1 *Cato's Letters* 96 (3d ed.1969), found its way into a few of the new states' constitutions. Of the nine states that explicitly protected the freedom of the press in this early period, none adopted the qualifying language from Blackstone. *See Tucci,* 859 S.W.2d at 67 (Phillips, C.J., concurring). Two of these states, however, adopted the "bulwark of liberty" language from Cato. Anderson, *supra* ¶ 33, at 492. The influential Virginia Bill of Rights of 1776 read: "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments." Va. Const. Bill of Rights, § 12 (1776). Later that same year, North Carolina adopted a very similar provision in its Declaration of Rights: "That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained." N.C. Const. Declaration of Rights XV (1776).

¶ 36 Of the early state constitutions, however, the Pennsylvania Constitution of 1776 contained one of the broadest statements of the freedom of speech of the original thirteen states. Robert F. Williams, *The State Constitutions of the Founding Decade: Pennsylvania's Radical 1776 Constitution and its Influences on American Constitutionalism,* 62 Temp. L.Rev. 541, 555 (1989). Of the original state constitutions, Pennsylvania's constitution was the only one to explicitly mention the general freedom of speech, distinct from the more specific freedom of the press enumerated in other state constitutions. 1 Friesen, *supra* ¶ 26, § 5–2(a); Anderson, *supra* ¶ 33, at 465. It provided that "the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained." Anderson, *supra* ¶ 33, at 465 (internal quotation marks omitted). Pennsylvania's 1776

---

The South Salt Lake ordinance is not a prior restraint upon speech. No board of censors is established to preview dance routines and costumes in order to judge which are deemed acceptable and which are not. The ordinance simply makes it unlawful to "[a]ppear in a state of nudity before a patron on the premises of a sexually oriented business." South Salt Lake City, Utah, Mun.Code § 5.56.310 (2005).

provision, with its plenary and unqualified formulation of the freedom of speech, even served as a model for the freedom of speech component of James Madison's initial proposal to Congress for the First Amendment.[10]

¶ 37 As the revolutionary fervor in the United States cooled, however, the broader ideas about the limits of the freedom of speech right embodied in the revolutionary constitutions were blunted by the more conservative Blackstone formulation of the freedom of the press.[11] Even the freedom of speech clause of the Pennsylvania Constitution was no exception to this trend, as the once plenary right of expression became qualified by the Blackstonian addendum requiring responsibility for abuse: "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Pa. Const. art. IX, § 7 (1790). In view of the liberal and unqualified nature of the 1776 clause, the addition of this Blackstonian limitation is no empty formulation, but represents a shift to a more limited freedom of speech right.

¶ 38 During the nineteenth century, as states were added to the Union and the original thirteen states began to revise their constitutions, the vast majority of the states adopted a "responsibility for abuse" provision. As of the year 2000, 43 state constitutions contained the "freedom of speech" tem-

pered by a "responsibility for abuse" clause. 1 Friesen, *supra* ¶ 26, at §§ 5–85 through 5–96. Even the Virginia and North Carolina Constitutions, with their rhetorical nods to the radical *Cato's Letters*, were swept up in this trend toward limited freedom of speech rights. While both maintained the "bulwarks of liberty" metaphor in their constitutions, North Carolina, in 1868, and Virginia, in 1870, qualified their broad freedom of speech protections with responsibility for abuse language.[12] *Tucci*, 859 S.W.2d at 52, 57. Although West Virginia is currently one of the seven states without this construction, the citizens of that state chose to revise their constitution in 1872 to specifically list exceptions to its freedom of speech guarantees: " 'No law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may by suitable penalties, restrain the publication or sale of obscene books, papers or pictures, and provide for the punishment of libel, and defamation of character....' " *Id.* at 58 (quoting W. Va. Const. art. III, § 7 (1872)).

¶ 39 This wave of state constitutional provisions providing limited protections for the freedom of speech reflects what one of our founding fathers saw as the states' greater authority to regulate speech. As President Thomas Jefferson wrote in 1804:

Nor does the opinion of the unconstitutionality and consequent nullity of [the Sedition Act of 1798] remove all restraint from the overwhelming torrent of slander which

---

**10.** Madison's proposal incorporated elements of the Pennsylvania Constitution as well as the "bulwarks of liberty" language from the Virginia Constitution: "The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable." Anderson, *supra* ¶ 33, at 473, 477–78.

**11.** Blackstone's "responsibility for abuse" language ironically first appeared in the once revolutionary Pennsylvania Constitution. 1 Friesen, *supra* ¶ 26, § 5–2(a). In 1790, the Federalist Party in that state replaced the radical 1776 constitution with a much "more conservative version." *Id.* Overall, the 1790 constitution rejected the radically democratic ideology of the 1776 constitution and was a defeat to the liberal Whig ideology that had infused it. *Ex parte Tucci*, 859 S.W.2d 1, 68 (Tex.1993) (Phillips, C.J., concurring).

**12.** In 1868, the North Carolina Constitution was amended to read: "The freedom of the press is one of the great bulwarks of liberty, and, therefore, ought never to be restrained, but every individual shall be held responsible for the abuse of the same." N.C. Const. art. I, § 20 (1868). Even Virginia, which had perhaps the most adamant rhetoric delineating the absolute nature of the freedom of speech in its freedom of speech clause, amended its constitution to explicitly acknowledge exceptions to even its ardent language. In 1870, Virginia amended its freedom of speech provision to read: "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments; and any citizen may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right." Va. Const. art. I, § 12 (1870).

is confounding all vice and virtue, all truth and falsehood in the U.S. The power to do that is fully possessed by the several state legislatures. It was reserved to them, and was denied to the general government, by the constitution according to our construction of it. While we deny that Congress have [sic] a right to [control] the freedom of the press, we have ever asserted the right of the states, and their exclusive right, to do so.... In general the state laws appear to have made the presses responsible for slander as far as is consistent with their useful freedom.

Letter from Thomas Jefferson to Abigail Adams (Sept. 11, 1804), *in The Adams–Jefferson Letters* 279 (Lester J. Cappon ed., 1988).

¶ 40 In sum, when the Utah framers chose to include "responsibility for abuse" in their formulation of the state's freedom of speech provisions, they chose a phrase with a long history of preserving the power of the state to regulate speech under certain historical exceptions. The foregoing history demonstrates that, rather than embracing more liberal ideas of the freedom of speech, the "responsibility for abuse" phrase articulates a conservative limitation upon the constitutionally granted freedom of speech right. This limitation, in turn, can be traced back to Blackstone's *Commentaries,* which specifically preserve the capacity of the state to restrict "immoral" speech.[13]

### D. The History and Context of Utah's Adoption of Its Freedom of Speech Provisions

¶ 41 Historical analysis of Utah's adoption of the freedom of speech clause reveals more precisely the parameters of its protections. Utah's constitutional convention provides some indication of the framers' intent in drafting our freedom of speech provisions.

More importantly, though, the minutes of the convention direct our analysis to an examination of the common law and statutory law then in effect in order to discern the values and policy judgments of the Utah citizens who ratified our constitution.

### 1. The Utah Constitutional Convention

¶ 42 The minutes of the 1895 Utah constitutional convention point to the fact that the framers of our constitution also envisioned a limited freedom of speech. When the chairman of the committee that wrote the declaration of rights presented the first draft to the convention as a whole, he emphasized the balance it sought to maintain between preserving important rights and not binding the hands of the legislature to carry out the will of the people. Thus, although the committee strove to enumerate fundamental rights, it also recognized that "if, on the other hand, we have inserted rights which ought to be left to the Legislature, we shall not be offended if they are stricken out." *Proceedings, supra* ¶ 13, at 200.

¶ 43 The debates over the freedom of speech clauses centered on this tension between protecting rights and allowing the legislature the freedom to make laws according to the will of the people. Although there was no substantial debate over the liberty and responsibility clause, there was extensive debate over the criminal libel clause in section 15 of article I. *Id.* at 319–23. This debate highlights the limited nature of the freedom of speech protections contained in the Utah Constitution as well as the deference the delegates gave to the common law.

¶ 44 At the behest of members of the Utah Press Association, Charles Goodwin, a lawyer and, for the previous fifteen years, the editor of *The Salt Lake Tribune,* offered a proposal for section 15 that differed in three respects

---

**13.** Contemporary with the passage of Utah's constitution, several states with constitutions containing similar "abuse" clause language limiting the freedom of speech recognized that limitation's roots in English common law. For example, a scant five months after the citizens of Utah voted their constitution into effect, the California Supreme Court interpreted its very similar constitutional freedom of speech clause by acknowledging its roots in a passage from Blackstone.

*Dailey v. Super. Ct.,* 112 Cal. 94, 44 P. 458, 459–60 (1896). Several other state courts have subsequently noted this connection to their own constitutional provisions containing the abuse qualification. *See State v. Jackson,* 224 Or. 337, 356 P.2d 495, 499–500 (1960); *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, 62 (1961); *Tucci,* 859 S.W.2d at 61 (Phillips, C.J., concurring).

from the original.[14] *Id.;* Jean Bickmore White, *Charter for Statehood: The Story of Utah's State Constitution* 110 (1996). First, Goodwin proposed to qualify the governmental restriction clause by repeating the responsibility for abuse clause. Immediately after the restriction on laws that "abridge or restrain the freedom of speech," Goodwin inserted the limiting phrase, "but all persons shall be responsible for the abuse of the privilege." *Proceedings, supra* ¶ 13, at 320. Thus, even Goodwin, the editor of a newspaper considered to be the leading critic of the state's dominant religion and a natural ally of a robust freedom of speech provision,[15] recognized the limited nature of the freedom of speech. Second, the criminal libel protections were extended to civil libel suits as well. *Id.* Third, the plaintiffs in civil suits would have to file bonds for costs or plead insolvency. *Id.*

¶ 45 While the first and third modifications received no comment, the second modification extending constitutional protections to civil cases sparked an intense debate over the law of civil libel. *Id.* at 319–23. Goodwin argued that it was necessary to explicitly extend protections to civil suits because judges would interpret section 15 as it then stood to mean that the truth could not be used as a defense in civil suits. *Id.* at 320. Charles Varian opposed the proposed amendment because, in his view, the amended version would unintentionally curtail then-existing rights. *Id.* Lecturing the delegates about the historical roots of the law of libel in the English common law, Varian noted that the proposed section would provide truth as a defense in civil suits only where good motives and justifiable ends could be proven, whereas, under the common law, truth was an unqualified defense in civil cases. *Id.* at 320–23.

¶ 46 The proposed amendment was ultimately defeated, *id.* at 322, but, as is often the case in interpreting convention votes, it is difficult to discern the intent of the delegates in doing so. It is impossible to tell with any degree of certainty whether the delegates were rejecting what Goodwin perceived to be increased protections to the freedom of speech or whether they were rejecting what Varian perceived to be an unintended hindrance to that same freedom. Yet a third possibility is that, confused by the complicated legal history, the delegates simply chose to stick with the status quo as the safest course of action. Whatever the delegate's motives, Goodwin clearly saw this as a defeat for the freedom of speech. In fact, he even proposed that section 15 be stricken from the constitution in its entirety because "[a]s it is, I think the section is a menace to everyone who publishes a newspaper in this State." *Id.* at 322. This extreme measure did not pass. *Id.* at 323.

¶ 47 Although the meaning of the vote on Goodwin's amendment is ambiguous at best, another amendment was proposed and voted on which allows us to draw a conclusion about the intent of the framers with more confidence. Nathaniel Kimball proposed an amendment that guaranteed protections to newspapers from civil suits without the defects of the Goodwin amendment by adding to the end of section 15 the clause, "and in civil prosecutions for libel the truth may be

---

14. The proposed amendment read:

> No law shall be passed to abridge or restrain the freedom of speech or of the press, but all persons shall be responsible for the abuse of the privilege.
>
> In all trials for libel the truth may be given in evidence and shall be a sufficient defense, if it shall appear to the jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, and the jury shall have the right to determine the law and the facts. Upon instituting suit for damages for libel, plaintiff shall file bonds for costs or plead insolvency.

*Proceedings, supra* ¶ 13, at 320.

15. *The Salt Lake Tribune,* which ironically began in 1870 under the name *Mormon Tribune,* quickly established itself as the voice of the non-Mormon minority in the state. *West v. Thomson Newspapers,* 872 P.2d 999, 1013–14 (Utah 1994). Throughout its early years, the newspaper expressed often harsh criticism of its leading competitor, the *Deseret News,* and the Mormon church leaders. *See id.* at 1013; *Soc'y of Separationists,* 870 P.2d at 925–26. Goodwin became the editor of *The Salt Lake Tribune* in 1880 and often criticized the Mormon church through his paper. White, *supra* ¶ 44, at 110. After the church officially abandoned the practice of polygamy in 1890, however, he espoused a somewhat more conciliatory stance. *Id.*

given in evidence, and if it shall appear to the jury that the matter charged as libelous is true, it shall be a complete defense." *Id.* at 323. This amendment, which unambiguously increased free speech protections, was rejected by the delegates, *id.*, indicating that they intended limited constitutional protection of that right. Thus the framers of the Utah Constitution left the regulation and protection of civil libel to the legislature and the common law.

¶ 48 Perhaps the more relevant lesson to be drawn from the debate over section 15 is the degree to which the framers relied on and followed the common law in drafting the state's freedom of speech provisions. Varian, in particular, went into great detail in explaining the history and development of the common law in England. This reliance upon the common law indicates that the delegates themselves saw the common law as establishing the boundaries of the freedom of speech.

2. The Common Law and Statutory Law in Effect at the Time the Freedom of Speech Provisions Were Adopted

¶ 49 The framers' reliance on the common law reinforces a well established principle that, in order to discern the outer limits of the freedom of speech, we must look to common law sources.[16] This court has previously noted the common law sources of Utah's constitutional provisions, stating as follows:

> The warp and the woof of the law in the Territory was the common law. The volumes of the Supreme Court Reports for the Territory of Utah are replete with the application of common law principles in all

kinds of property, personal injury, and contract cases, as well as on procedural issues. Indeed, various provisions of the Utah Declaration of Rights cannot be understood without reference to the common law and the history of Anglo–American law. For example, the provisions in the Declaration of Rights with respect to the right of free speech, the privilege against self-incrimination, the right to jury trial, etc., are all rooted in, and grew out of, the common law heritage that defines the scope and meaning of many provisions in both the Utah and the United States Constitutions. Indeed, this Court has often resorted to the common law in construing various provisions in the Utah Declaration of Rights.

*Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 54, 974 P.2d 1194 (Stewart, J., concurring). Thus, we must look to the common law to determine if nude dancing fits within the scope and protection of Utah's freedom of speech provisions.

¶ 50 The laws in effect in Utah in 1895, both statutory and common law, give us the clearest picture of the values and policy judgments of the people of Utah when they voted for their constitution. These laws reflect the boundaries that the citizens of Utah conceived between the conflicting societal values of individual rights and the power of a duly elected government to carry out the will of the people. Both the statutes drafted by the territorial legislature and the earliest laws generated by the new state legislature reflect the values of the citizens who voted their local representatives into office. The com-

---

16. Speaking of the common law's influence on state constitutional provisions that protect the freedom of speech, Thomas Cooley wrote:

> They do not create new rights, but their purpose is to protect the citizen in the enjoyment of those already possessed. We are at once, therefore, turned back from these provisions to the common law, in order that we may ascertain what the rights are which are thus protected, and what is the extent of the privileges they assure.

Cooley, *Constitutional Limitations*, supra ¶ 13, at 416–17.

The U.S. Supreme Court has also recognized this principle in interpreting the Bill of Rights:

> The law is perfectly well settled that the first ten amendments to the Constitution, common-

ly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed.

*Robertson v. Baldwin*, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897), *partially quoted in Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 34, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (Scalia, J., concurring).

mon law then extant also represents the accepted legal heritage that the people of Utah brought with them when they immigrated to this state. Indeed, the people of this state, through their legislature, explicitly adopted the common law soon after statehood.[17]

¶ 51 Both the common law and the statutory law in force at the time of the formation of our constitution demonstrate that obscene speech was not protected by the freedom of speech. As already noted, Blackstone, the original source of the liberty and responsibility clause of our constitution, specifically stated that the punishment of "immoral" speech did not constitute an infringement of the liberty of the press. Blackstone, *supra* ¶ 32, at *151–53. Lest this connection to Blackstone be dismissed as a hollow and formalistic reference to long forgotten principles, the most respected constitutional scholar at the time of the drafting of the Utah Constitution noted that the freedom of speech contained in state constitutions did not protect obscenity. Thomas Cooley, an authority quoted on the floor of the Utah constitutional convention, noted that the freedom of the press signifies

> the liberty to utter and publish whatever the citizen may choose, and to be protected against legal censure and punishment in so doing, provided the publication is not so far injurious to public morals or to private reputation as to be condemned by the common-law standards, by which defamatory publications were judged when this freedom was thus made a constitutional right.... Blasphemous and indecent publications, and the exhibition of indecent pictures and images, were always punishable at the common law....

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 285–86 (2d ed. 1891). While, in this passage, Cooley specifically refers to the freedom of the press clause in the United States Constitution, he elsewhere makes the same observation of the freedom of speech provisions found in state constitutions. Coo-

ley, *Constitutional Limitations, supra* ¶ 13, at 422.

¶ 52 The United States Supreme Court in decisions contemporaneous to the drafting of the Utah Constitution has reflected this view in dicta. *See Robertson v. Baldwin,* 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897) ("Thus, the freedom of speech and of the press (art. I) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation."); *In re Rapier,* 143 U.S. 110, 134, 12 S.Ct. 374, 36 L.Ed. 93 (1892) ("We cannot regard the right to operate a lottery as a fundamental right infringed by the legislation in question; nor are we able to see that Congress can be held, in its enactment, to have abridged the freedom of the press.... [T]he government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people."); *Ex parte Jackson,* 96 U.S. 727, 736, 24 L.Ed. 877 (1878) ("In excluding various articles from the mail, the object of Congress has not been to interfere with the freedom of the press, or with any other rights of the people; but to refuse its facilities for the distribution of matter deemed injurious to the public morals."). In keeping with the Court's language on the matter, at least one federal court in the decade in which the Utah Constitution was written and ratified held directly that punishment for the distribution of obscene materials did not run afoul of the First Amendment. *United States v. Harmon,* 45 F. 414, 416 (D.Kan. 1891), *rev'd on other grounds, Harman v. United States,* 50 F. 921 (C.C.D.Kan.1892).

¶ 53 These federal decisions not only articulate the widely accepted view of the common law in the late nineteenth century, they also demonstrate the prevailing view of the scope of freedom of speech rights in that era. Consistent with those federal decisions, this court has also held that the Utah Constitution, like the United States Constitution, does not protect obscene speech. *See W. Gallery Corp. v. Salt Lake City Bd. of Comm'rs,* 586 P.2d 429, 430 (Utah 1978). After analyzing statutes in effect at the time

---

**17.** "The common law of England, so far as it is not repugnant to, or in conflict with the constitution and laws of the United States, or the consti-

tution and laws of this state, shall be the rule of decision in all the courts of this state." Utah Rev. Stat. § 2488 (1898).

of the drafting of their constitutions, several of our sister states with similar constitutional provisions have also held that their constitutions do not protect obscenity. *See People v. Ford*, 773 P.2d 1059, 1064–66 (Colo.1989); *Fordyce v. State*, 569 N.E.2d 357, 360–62 (Ind.Ct.App.1991); *State v. Marshall*, 859 S.W.2d 289, 294 (Tenn.1993).

¶ 54 Thus, it was a well established and widely recognized principle of constitutional law at the time of the drafting of the Utah Constitution that obscene speech was not protected speech, and this court has explicitly ruled that our constitution does not shield it from government regulation. There remains, however, the specific question of whether nude dancing falls within the unprotected category of obscenity or whether the citizens of Utah intended to protect it under its free speech provisions.

¶ 55 The laws in effect at the time of the Utah Constitution's ratification clearly indicate that, if the people of this state ever considered nude dancing to be speech, it must have been a punishable abuse of that freedom. Laws enacted soon after the Utah Constitution was ratified clearly forbade activities such as nude dancing. In 1898, the Utah legislature enacted a law making it a crime to "employ any female to dance, promenade, or otherwise exhibit herself" in any "saloon, dance cellar, or dance room, public garden, public highway, or in any place whatsoever, theatres excepted," or for a female to engage in such activity. Utah Rev. Stat. § 4244 (1898).

¶ 56 Justice Nehring contends that the purpose of this and other similar statutes was "to regulate gender roles, not expression." *Infra* ¶ 189. We disagree. Although the legislature may have been concerned with regulating gender roles, it was also clearly interested in regulating the content of various activities, including dancing, as evidenced by several gender-neutral statutes. For example, even before the passage of Utah's constitution in 1888, the very same territorial statute that forbade speech traditionally punishable as obscene under the common law also forbade any person to "[e]xpose[ ] his person" or

procure[ ], counsel[ ] or assist[ ] any person so to expose himself, or to take part in any model artist exhibition, or to make any other exhibition of himself to public view, or to the view of any number of persons, such as is offensive to decency, or is adapted to excite to vicious or lewd thoughts or acts.

Compiled Laws of Utah § 4527(1)-(3) (1888). Thus, when the Utah Constitution was ratified, it was illegal for either men or women to expose themselves to even willing participants in such a way as to excite lewd thoughts. Such activities were lumped together into the same category as obscene speech contained in print or pictures, which traditionally did not enjoy constitutional protection. After Utah attained statehood in 1896, a commission was appointed to revise the territorial laws and "make them conform to the constitution." Utah Rev. Stat. at iii. In 1897, the state legislature adopted statutes identical to the aforementioned territorial laws, expressing its approval of their conformity to the new state constitution. Utah Rev. Stat. § 4247(1)-(3) (1898).

¶ 57 Thus, in 1895, when the people of our state ratified our constitution, they considered nudity that was offensive to decency or that excited lewd thoughts to be unacceptable in Utah. In 1897, the state legislature, duly elected by this state's citizens, reaffirmed the judgment that activities such as nude dancing could be prohibited by the state of Utah. In view of this historical evidence, we conclude that those who framed and ratified Utah's constitution did not intend to extend its protections to nude dancing.

¶ 58 In summary, the scope of the constitutional provisions guaranteeing the right of Utah citizens to "communicate freely their thoughts and opinions, being responsible for the abuse of that right," is unclear from the constitutional text. In interpreting their scope, it is therefore appropriate for us to consider historical context and other evidence of the framers' intent. The debate over the provisions at issue establishes that the framers looked to the common law to provide the boundaries of the right to free expression. And both the common and statutory law in effect at the time demonstrate

that nude dancing does not fall within the scope of constitutionally protected communication. We accordingly hold that nude dancing in plaintiffs' sexually oriented businesses is not entitled to protection under the freedom of expression clauses of the Utah Constitution.

## II. PLAINTIFFS' OTHER CLAIMS

¶ 59 In addition to their freedom of speech argument, the Businesses claim that they have been the victims of an unconstitutional "taking" without due process of law. This argument is based on their assertion that they had a property right in their business licenses that allowed nude dancing on the premises, that those licenses were eliminated as a class, and that the Businesses were unable to obtain a new class of license allowing partial nudity and serving alcohol because of a restriction on the number of licenses available. The City counters that due process simply requires notice and the opportunity to be heard with respect to the prior license, and "taking" has nothing to do with application for the new licenses in this instance. We agree with the City.

¶ 60 Although this court has recognized that there is a property interest in a business license, the requirements of due process can be satisfied via notice and a hearing, both of which occurred here. *See Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581. Due process is not implicated by the City's failure to award additional alcohol licenses to the Businesses, which would allow them to feature semi-nude dancing and alcohol. Although granting such licenses may increase the likelihood of prosperity for the Businesses, denying such licenses does not contravene due process.

¶ 61 The Businesses also assert that the City was without authority to enact the ordinance at issue because the legislature has preempted the field. The legislative statute in question addresses nudity in "places open to public view"; the Businesses contend that because the City's ordinance bans nudity only in nude dancing establishments, it is inconsistent with, and preempted by, the state statute. We disagree.

¶ 62 The City has ample authority to enact the ordinance, and it is not in conflict with any state law. *See Call v. City of W. Jordan*, 606 P.2d 217, 219 (Utah 1979). Pursuant to Utah Code section 10–8–84 (2003), cities have the power to regulate businesses through licensing policies and the enactment of ordinances. Because it is well established that Utah municipalities have the right to legislate on the same subject as a state statute where the general welfare power is at issue, we reject the Businesses' argument that the legislature has preempted the field or that the ordinance conflicts with state law.

¶ 63 We finally turn to plaintiff Reid's claim that the district court erred in granting summary judgment against him. Plaintiff Reid operates a lingerie and novelty store. While the other plaintiffs challenged the ordinance on the basis that its ban on nude dancing violated the freedom of expression guarantees of the Utah Constitution, Reid challenged the ordinance on vagueness grounds. The ordinance applies to those businesses that derive a "significant or substantial" portion of their revenues from the sale of adult products or that devote a "substantial section" of their sales or display space to such products. Reid's complaint alleged that this language was unconstitutionally vague because it was impossible for him to determine whether the ordinance applied to him. On appeal, Reid asserts that the district court erred in granting summary judgment against him because none of the briefing or argument in the district court analyzed his vagueness claim. We agree.

¶ 64 Because a summary judgment presents questions of law, we accord no deference to the ruling of the district court. Rather, we review it for correctness. *Salt Lake County v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 11, 89 P.3d 155. We conclude that the district court's summary judgment order was overly broad. When the parties filed cross-motions for summary judgment on the nude dancing issues, none of them presented any facts or argument with respect to

Reid's vagueness claim.[18] In fact, none of them mentioned the vagueness claim at all. Nevertheless, the district court's summary judgment order erroneously stated that "[p]laintiffs' complaint and causes of action are dismissed on the merits, with prejudice." Plaintiff Reid attempted to remedy this overly broad order by filing a motion seeking to dismiss his vagueness claim without prejudice, thereby preserving his ability to litigate it on the merits in the event that the City later attempts to enforce the ordinance against him. The district court, however, denied Reid's motion on the basis that the summary judgment motions had not carved out Reid's vagueness claim. We conclude that such an approach is erroneous. The fact remains that none of the summary judgment filings purported to include Reid's vagueness claim and that the record is devoid of any factual or legal support for the district court's entry of summary judgment on that claim. The parties were not required to carve out a claim that was never even under consideration. We accordingly direct that the district court's summary judgment order be modified to reflect that the dismissal of Reid's vagueness claim is without prejudice.

## CONCLUSION

¶ 65 In light of historical evidence, it is inconceivable that the framers of our constitution or the citizens of this state intended to protect nude dancing under the constitutional right of the freedom of speech. The framers of the Utah Constitution chose a limited construction for the freedom of speech that excepted from protection abuses of that right. This constitutional construction has a long history of preserving the power of the state to regulate speech under certain historical exceptions to that right. It was widely recognized at the time Utah's constitution was drafted that obscene speech was one of the exceptions to constitutional freedom of speech protections. Nude dancing, in particular, was criminalized by statutes in effect both before and after our constitution was ratified by the people of this state. There-

fore, the citizens of Utah, having expressed their disapprobation of such activities through such statutes, clearly would have considered nude dancing to be outside the scope of constitutionally protected communication.

¶ 66 In light of the clear disapprobation the people of our state demonstrated for activities such as nude dancing, extending free speech protections in this area would run contrary to the intent of the framers of our constitution and the Utah citizens who voted it into effect. Were we to do so, we would not be interpreting our constitution, but substituting our own value judgment for that of the people of Utah when they drafted and ratified the constitution. It is not our place to do so. Social values and public opinion on this matter no doubt fluctuate over time, and as they do, the people of this state are free to allow nude dancing through legislative enactments or even to amend our constitution to extend protections over such activities through the democratic process. Although Chief Justice Durham argues skillfully for the protection of expression that society might find distasteful, these arguments should be directed to elected officials and expressed at the ballot box, not enforced through the courts.

¶ 67 Accordingly, we reject plaintiffs' claims that the ordinance violates the Utah Constitution's right to free expression. We similarly reject plaintiffs' subsidiary claims except plaintiff Reid's vagueness claim, which we conclude should be dismissed without prejudice. In all other respects, we affirm the decision of the district court.

¶ 68 Associate Chief Justice WILKINS and Justice DURRANT concur in Justice PARRISH'S opinion.

DURRANT, Justice, concurring:

¶ 69 Much of the greatness of our nation lies in our ongoing struggle to advance, improve, and better ourselves both individually and collectively. Our pluralistic system al-

---

18. The lack of focus on Reid's vagueness claim in the summary judgment proceedings is probably explainable by the fact that the City had informed Reid it would not require him to obtain a

sexually oriented business license. The City, however, declined to stipulate to the inapplicability of the ordinance, thereby preserving its ability to reevaluate its position at a later time.

lows countless individuals and myriad groups to seek to advance their views of what makes for a better society and to oppose the views of those who believe otherwise. The many contrasting ideas competing for ascendancy in the public debate make for tempestuous seas. Considering the intense conviction and passion devoted to various ideals, it is no small accomplishment that our nation has been able to navigate these seas in a largely peaceful fashion.

¶ 70 As a nation, we now find ourselves with a combination of freedom, wealth, and opportunity unmatched in world history. In my view, the factor most responsible for this miraculous result is our nation's Constitution, which has provided a sound framework for democratic debate and societal evolution while simultaneously protecting certain rights from restriction by ordinary political processes. The unquestioned importance and force of the Constitution's terms has spurred perhaps the greatest ongoing jurisprudential debate affecting this nation: how are we to decide what the Constitution means? While the vast majority of scholarly attention has been directed toward answering this question in relation to the Federal Constitution, the same debate rages throughout the states of this union, each of which wrestles with the meaning of its own constitution. The present case requires this court to grapple with the difficult questions permeating the debate as to the proper method to follow when interpreting our state constitution.

## I. THE INTERPRETIVE TASK AT HAND

¶ 71 We are called upon to assess the constitutional validity of a city ordinance prohibiting nude dancing in sexually oriented businesses. Under federal constitutional law, such dancing "falls only within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). Plaintiffs, which own sexually oriented businesses affected by the ordinance, concede that it would be difficult, if

not impossible, to succeed in arguing that the city's prohibition on nude dancing violates the United States Constitution's protection of the right of free speech.[1] As a result, Plaintiffs have structured the current litigation so as to focus exclusively on the protections afforded by our state constitution.

¶ 72 The dispute in the present case, though nominally limited to a handful of plaintiffs, is a manifestation of the broader tension between the will of the majority in our democratic society and those protections constitutionally afforded the minority. As a general matter, the right of the democratic majority to regulate and outlaw behavior ceases at the point at which constitutionally protected rights are unduly infringed. Where, as is demonstrated by the majority opinion, historical evidence indicates that nude dancing in sexually oriented businesses is not within the ambit of protected communication under our state constitution, the proper role of this court is to allow the democratic process to resolve issues pertaining to the restriction of that conduct. I therefore concur in the majority opinion.

## II. THREE APPROACHES TO CONSTITUTIONAL INTERPRETATION

¶ 73 I write separately to further explain the manner in which I arrived at this conclusion. As noted above, the fundamental question presented in this appeal is whether our state constitution extends protection to nude dancing in sexually oriented businesses. To answer this question, we must interpret the relevant provisions of our state constitution and discern the breadth of the protections provided therein. When faced with such an interpretive task, our first step must be to determine how we should discharge our interpretive function. In other words, we must ascertain any mechanisms that are available to aid us in our interpretive task and then decide which of those mechanisms we may appropriately use. Almost all approaches to constitutional interpretation purport to begin with the text of the provision at issue. The crux of the quandary is therefore determin-

---

1. Indeed, some of Plaintiffs' dancers have litigated claims under the federal free speech clause and lost in that effort. *Heideman v. S. Salt Lake City*, 165 Fed.Appx. 627, 634 (10th Cir.2006).

ing where we, as judges, should look for guidance when assessing the meaning of that text. Drawing on approaches adopted and advocated in relation to the interpretation of the federal constitution, and those previously employed by this court, I see essentially three possible approaches to constitutional interpretation, together with various combinations thereof: (1) we can' assign meaning to the text based on the attitudes and views of contemporary society (the "contemporary-context approach"); (2) we can assign meaning to the text based on our own individual attitudes and views (the "subjective approach"); or (3) we can assess the meaning of the text based on the understanding and intent of those who drafted and ratified the constitution (the "historical approach").[2]

¶ 74 All three of these approaches ask the question "what does the provision mean?" The contemporary-context approach asks "what *should* the provision mean in the context of our modern values and attitudes?" The subjective approach asks "what *should* the provision mean according to the interpreting judge's own personal values and attitudes?" The historical approach asks "what *did* this provision mean to those who drafted and ratified it?" While the answer to the first two questions would seem to be a moving target, the answer to the last one, at least in theory, is fixed. As I will explain hereafter, I believe that the appropriate question is the last one.

## A. The Contemporary–Context Approach

¶ 75 Turning first to the contemporary-context approach, it can be argued that any interpretation of our constitution must be cognizant of that document's present societal context. Adherents to this approach consider the constitution a living, evolving document that is malleable, sensitive to, and capable of reflecting changing social conditions, attitudes, perceptions, and trends. As a result, use of the contemporary-context approach can lead to the elevation of an evolving or evolved social view to special legal status, thereby "constitutionalizing" a widely held social belief. Such an approach relies on the premise that the constitution is a document enshrining principles, the content of which can change over time, and that it is the role of the judiciary to discern the breadth of activity protected by constitutional principles in contemporary society.

¶ 76 It is true that our state constitution is a document that rarely delves too deeply into particulars. Instead, it can be conceived of as a broad outline of our state structure, enabling democratic functionality while compelling moral reverence for the rights of those not in the majority. It can certainly be argued that we should interpret the constitution to give effect to the societal values that exist in that document, independent of the words chosen to signify those values. In other words, one may contend that, although the constitutional language expressing the principle of free and unfettered speech has remained the same, our society's conception of that principle, or our society's belief as to what speech must be protected to serve that principle, may have changed.

¶ 77 While the contemporary-context approach is not without its appeal, and certainly does not lack for adherents, I find it unsatisfactory for a number of reasons. First, it casts judges in the role of opinion pollsters, a position I am skeptical judges are necessarily qualified to undertake, as it requires them to assess popular opinion and cultural trends. Second, and more fundamentally, I am at a loss to discern the source of judicial authority to conduct such a societal survey. I am aware of no authorization,

**2.** The term "originalist" is commonly applied to the kind of interpretive approach I have identified here and will be explaining further. "Originalist" refers to the focus the approach places upon the original meaning or intent of a constitutional provision. That term has been the subject of extensive scholarly debate and has come to include various nuances of meaning and various schools of thought. Moreover, it has come to be politically charged. An originalist interpretation is often perceived to necessarily dictate a politically conservative result. I have chosen to use the term "historical approach" because I believe it is as descriptive as "originalist" (it looks to the historical meaning of a constitutional provision at the time of the constitution's drafting and ratification), and I do not wish to suggest adherence to any particular strain of originalism. I intend the term "historical approach" to mean no more and no less than the meaning I ascribe to it in this opinion.

whether contained within the constitution or otherwise, that grants judges the ability to shape the constitution to match what they believe to be the changing contours of our society. Third, molding the constitution to reflect changing social attitudes, even if the judicial branch were adequately equipped to recognize such changes, seems to be a usurpation of the role the legislative branch is designed to play in our government. Indeed, the legislative branch is the branch of government that is expressly designed to adjust our legal framework to reflect contemporary context. Accordingly, if certain behavior is not granted protection by the federal or state constitution, that does not end the debate as to whether that behavior will be tolerated by society. The people remain free to employ the democratic process to allow or prohibit such behavior. If it so happens that the prevailing view of society toward a certain behavior has altered over time, society is fully empowered to implement that view through use of the democratic process. Of course, the will of the majority is checked by established constitutional protections. Our role as judges is to identify and fortify the wall protecting those rights specified in the constitution from majoritarian override.[3]

¶ 78 If the framers of the constitution chose not to include a particular behavior within the constitution's protective sphere, debate and action addressing that behavior should occur in the democratic arena. Society should seek to resolve disagreements concerning the proper scope of governmental regulation of unprotected behavior through political debate and contest, not judicial fiat. Our society is best served when the line between judging and legislating is clearly drawn. Looking to social attitudes in an attempt to shape the constitution through interpretation strikes me as more akin to legislating than judging, and I would therefore reject that approach to constitutional interpretation.

## B. The Subjective Approach

¶ 79 Turning to the second interpretive approach identified above, the subjective approach, I admit that it is indeed enticing to adopt an interpretive technique whereby we, as judges, look to our own attitudes and views to discern the contours of the protective boundary erected by our state constitution. Under this approach, the constitution becomes an instrument by which judges can implement their own social views, irrespective of historical understanding or predominant modern social attitudes, perceptions, or trends. Judges are human, after all, and each judge no doubt has strong convictions as to what makes for a better society. The inescapable presence of those convictions has, I suspect, tempted many judges to strike down a legislative act as unconstitutional because the act is viewed, from a personal perspective, as wrongheaded or socially harmful. Furthermore, when faced with majoritarian curtailment of behavior that a reviewing judge believes to be in need of protection as part of a humane and decent society, the temptation to conclude that the right to engage in such behavior is enshrined within the penumbra of our constitution's express protections is powerful to say the least.

¶ 80 I do not discount the argument that judges following the course set by their own moral compass when discharging their judicial duties may be trusted and valuable stewards of public policy. Judges are, after all, generally highly educated, well intentioned, thoughtful, and (we hope) wise. Further, judges are largely protected, at least in our state's system, from the ever-changing political winds and are able to make policy pronouncements with the benefit of a full hearing in which both sides to a particular debate are given the opportunity to state their case. If the hallmark of the judicial process is sound reasoning conducted with the aim of

3. Perhaps ironically, it is through the will of the majority that minority rights gain protection. After all, the adoption of a constitution is a majoritarian process and, due to the nature of our government, minority rights are always in some risk of curtailment. Amendment of our state constitution could presumably be utilized to remove rights previously given constitutional protection. If this conception of constitutional government is taken to its logical conclusion, the only true check on majoritarian power is the majority's own submission to and reverence for constitutionally enshrined protections.

arriving at the best possible result, irrespective of political forces mounting against that result, it is easy to see why many find the notion of entrusting major social policy decisions to the judicial branch appealing.

¶ 81 Despite its allure, however, I also find the subjective approach to constitutional interpretation unacceptable and consider it even more dangerous than the contemporary-context approach outlined above. Under the contemporary-context approach, the judiciary would at least moor its social policy pronouncements to either perceived majority views or, at the very least, a perceived groundswell of support for a given policy proposition. In contrast, a judge following the subjective approach would wield virtually unchecked power to modify the social contours of our society in a dramatic manner. Further, although a judge operating under the subjective approach to constitutional interpretation would be nominally constrained by the text of the constitution, that constraint is drastically minimized by the reality that the unambiguous communication of ideas through the use of language is a difficult task. Given the inadequacies of the written word and the judiciary's charged task of finding meaning in the text of the constitution, a judge operating under the subjective approach can utilize definitional flexibility to rationally read personal beliefs into the constitution. For example, a determined and creative judge can expand the term "speech" or "communicate" to include virtually any aspect of human conduct.

¶ 82 If the contemporary-context approach to constitutional interpretation is more akin to legislating than judging, the subjective approach to constitutional interpretation is more akin to dictating than judging. Therefore, for the reasons outlined above, I conclude that the subjective approach should be rejected.

### C. The Historical Approach

¶ 83 A judge operating pursuant to the third approach outlined above, the historical approach, would look not to the prevailing views of contemporary society or to his or her own personal views on the questions of the day. Rather, under this approach to constitutional interpretation, the judicial enterprise is anchored to the text of the constitution as understood and intended by its framers and the voters who ratified it. Whatever other skills, talents, and insight judges possess, interpreting the language of various texts is something all judges are trained to do. We are frequently required to interpret texts, whether they be regulations or laws promulgated by the government or contracts between private parties. And it is well established that our goal in interpreting these texts is to give effect to the intent of the texts' creators. *E.g., Burns v. Boyden,* 2006 UT 14, ¶ 19, 133 P.3d 370 (court rules); *Allstate Ins. Co. v. Wong,* 2005 UT 51, ¶ 25, 122 P.3d 589 (contracts); *State v. Maestas,* 2002 UT 123, ¶ 52, 63 P.3d 621 (statutes). Therefore, application of this same interpretive approach to a constitutional text is a task that we, as judges, are qualified to accomplish, experienced with, and comfortable undertaking.

¶ 84 Admittedly, the historical approach is less glamorous than the first two approaches discussed above, which enable judges to make dramatic contributions to society and shape the social structure in a manner they deem beneficial. The judge looking to the text of the constitution is engaged in a more workmanlike function. Such a judge does not alter our society's blueprint in an attempt to improve our societal project, but merely ensures that the people of this state, the constitutionally sanctioned architects of our society, are aware of what the blueprint contains and are operating in accordance with that document's terms. Under the historical approach, judges are more referees than players in the grand political game. While adopting the first or second approach to constitutional interpretation could, in some instances, result in a net benefit to society if judges' choices are truly wise and clairvoyant, I believe that as a general rule the judicial branch can best serve the people of this state by adopting a historical approach to constitutional interpretation. This approach provides stability to state government while remaining true to the principle that it is the people of this state who should ultimately determine how our society should be

structured. When a particular action of our state's government is challenged as violative of our constitution, we should proceed in a methodical fashion with a traditional textual analysis by testing the challenged action against the intended meaning of the constitution. We may disagree with an action taken by the legislative or executive branch, we may find a statute or regulation wrongheaded, even silly, but if the challenged act does not impinge upon a constitutionally protected right, it is not our place to void that act. Rather, we should strictly adhere to our judicial function and allow the democratic process to serve as the mechanism to resolve disagreements over social policy.

¶ 85 In advocating the historical approach, I am not blind to its attendant problems. At times, the intent of those who drafted our constitution is difficult to discern, and even the purest of adherents to the historical approach cannot wholly avoid the influence of changing social attitudes and personal views as to what is best for society. Beyond these apparent difficulties, it is frequently argued that this interpretive approach moors society to antiquated notions of what makes for a healthy and productive society and that the dead hand of the framers, who lived centuries ago, should not be given reign over the living. While I acknowledge the real interpretive difficulties encountered by judges applying this approach, I regard the last argument as a red herring. While it is true that, under the historical approach, our constitutional analysis is focused on the understanding of those who drafted the document at a particular time, it does not follow that we are sentenced to live in a static society. The democratic process remains vibrant, flexible, and fully capable of responding to societal change. Indeed, far from promoting a static society, a judiciary constrained from constitutionalizing personally held values or current social attitudes actually promotes societal flexibility.

¶ 86 Despite the difficulties that attend the historical approach to constitutional interpretation, I see no other workable alternative, no other alternative that would not unnecessarily blur the lines between the branches of government, and no better way of balancing the need for constitutional protection of minority rights with the freedom of a democratic people to shape their society as they see fit. It is for these reasons that I conclude that a historical analysis of our state constitution is the most appropriate interpretive course to follow when confronted with constitutional questions.

## III. THE FRAMERS DID NOT INTEND THE FREE SPEECH RIGHT TO PROTECT NUDE DANCING IN SEXUALLY ORIENTED BUSINESSES

¶ 87 A review of our prior decisions demonstrates that "this court has a very long history of interpreting constitutional provisions in light of their historical background and the then-contemporary understanding of what they were to accomplish." *In re Young*, 1999 UT 6, ¶ 15 & n. 5, 976 P.2d 581. Our decisions have employed the following interpretive approach. As with other texts, we start with the language of the constitutional provision in question. *In re Worthen*, 926 P.2d 853, 866 (Utah 1996). Where the language of the provision is plain, that is to say, where its meaning as intended or understood by its framers is beyond debate, we need proceed no further. *See id.* But when the language is ambiguous, either as to its scope or otherwise, we must necessarily broaden the scope of our inquiry. *Id.* When looking beyond the language in question, we consider historical evidence regarding textual development, sister state law, and policy arguments relied upon by the framers in the form of economic and sociological materials. *See Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 921 n. 6 (Utah 1993). "Each of these types of evidence can help in divining the intent and purpose of the framers, a critical aspect of any constitutional interpretation." *Id.* Nothing in this case suggests that a departure from our customary use of the historical approach is necessary, advisable, or even allowable.

¶ 88 Chief Justice Durham's dissenting opinion is nevertheless bereft of any attempt to ascertain the intent of the framers of the constitutional provisions at issue. The Chief Justice justifies this by two arguments. First, she argues that the meaning of the

free speech right is plain and that therefore it is unnecessary to consider the intent of the framers. Second, she appears to argue that reliance on the intent of the framers is ill-advised because it can sometimes lead to bad results. In his dissent, Justice Nehring accepts the historical approach but argues that the historical record supports a natural-law construction of the free speech right, which would offer some protection to nude dancing in sexually oriented businesses. I address each of these arguments in turn.

### A. The Intent of the Framers Cannot Be Ignored by Asserting that the Meaning of the Free Speech Right Is Plain

¶ 89 Although the Chief Justice superficially recognizes the import of the framers' intent, *infra* ¶ 127, she avoids any real inquiry into that intent by claiming that the provision at issue is unambiguous. Specifically, she argues that because the Utah Constitution itself plainly defines what constitutes free speech, "it is not necessary to consult the framers in order to arrive at the proper definition of free speech." *Infra* ¶ 130. Yet the term she advances as conclusively defining speech—"communication"—is by no means plain and requires interpretation no less than does the term it purports to define.

¶ 90 The question of what constitutes speech under the United States Constitution is one that has occupied judges and scholars for over two centuries. No one could reasonably suggest that the term is so clear as to preclude debate regarding its meaning. Nor does the Chief Justice so suggest. She does contend, however, that this famously ambiguous term is rendered clear in the Utah Constitution because that document defines "speech" as "communication." The obvious flaw in this reasoning is that the term "communication" is no more amenable to easy definition than is the term "speech." They are two words of the same nature that beg interpretation. To argue that "speech" and "communication" are words so clear as to preempt debate regarding their meaning is no more tenable than it would be to make the

same argument regarding constitutional terms like "establishment," "cruel and unusual," or "due process."

¶ 91 The Chief Justice proceeds to assert a so-called "plain meaning" definition of "communication" that is virtually unlimited in its scope and would no doubt astonish those who included the term in the Utah Constitution. She argues that "the right to freely communicate" "is expressed in broad, sweeping, and comprehensive terms, with no qualifications placed on the forum, method, or medium of communication," and that "it is beyond dispute that the act of communicating extends beyond mere words to encompass a wide variety of expressive activity." *Infra* ¶ 116.

¶ 92 The term "speech" as used in the United States Constitution also includes no qualifications as to "forum, method, or medium" of speech, but that has not led to it being construed in the broadest conceivable sense. Yet that is precisely the construction the Chief Justice advances as the plain meaning of "communication." As she interprets the word in her dissent, virtually any conduct—from purveying obscenity to soliciting prostitution—qualifies as "communication" and would, accordingly, be afforded protection under our state constitution so long as the conduct does not fall within her narrow interpretation of our constitution's "abuse of that right" language.[4] This broad construction would arguably require the State to satisfy heightened scrutiny for almost every law that regulates conduct. I disagree that the framers' use of the word "communicate" mandates such a broad construction. As the plain meaning does not mandate the dissent's interpretation, that interpretation must stem from sources external to the constitutional text.

¶ 93 Indeed, the Chief Justice, although relying nominally on a plain meaning analysis, clearly looks to our contemporary context for guidance in her interpretation. She asserts that "[t]he question is not whether the framers would have considered the conduct

---

4. Indeed, Chief Justice Durham cites with favor a passage in which the Oregon Supreme Court concludes that the protection of expression under that state's constitution extended even to "explic-

it sexual conduct." *Infra* ¶ 138 (quoting *State v. Ciancanelli*, 339 Or. 282, 121 P.3d 613, 629 (2005)).

communicative; if it is communicative, that is enough." *Infra* ¶ 130. She further asserts that "[t]o hold that the free speech provisions of the Utah Constitution mean only what they did in 1896 risks the creation of constitutional doctrine that eviscerates the fundamental right to 'freely communicate.' " *Infra* ¶ 136. Thus, it is not the meaning of the free speech right to those who created it that governs, according to the Chief Justice, but its meaning in our contemporary context. In essence, the Chief Justice applies a contemporary-context approach in plain language garb.

¶ 94 Consistent with her contemporary-context approach, the Chief Justice supports her assertion that the term "communication" has come to include nude dancing in sexually oriented businesses by describing the evolution of public attitudes toward dance in general and erotic dance in particular. Yet, as this court has stated in the past, our task is to discern the intent of the framers when interpreting a constitutional provision. We stray beyond this role if we attempt to illuminate the meaning of particular language by turning to our modern understanding of the terms used. As I have argued in Part II above, it is more appropriate under our tripartite constitutional democracy to determine whether nude dancing in sexually oriented businesses was included within the right "to communicate ... thoughts and opinions" as that right was understood by those who created it.

¶ 95 Before addressing the Chief Justice's critique of the historical approach, I find it necessary to discuss briefly her cursory dismissal of the majority's analysis of our constitution's "abuse of that right" language. It is remarkable that the Chief Justice construes "communicate" in its broadest sense while giving "abuse of that right" an exceedingly narrow construction. She bases this construction on her conclusion that, at a minimum, an "abuse" must entail some "harm." *See infra* ¶ 128.

¶ 96 Assuming Chief Justice Durham's premise that "abuse" is inextricably linked to "harm," I am not convinced that the concept of "harm" should be limited to tangible, deleterious secondary effects, such as increased crime rates or decreased property values. Alexander Bickel makes a salient point when he argues that to grant an unrestricted "right to obtain obscene books and pictures in the market" may have a more fundamental effect on society than merely rising crime rates. Alexander Bickel, *The Morality of Consent* 73–74 (1975). As Bickel states,

> To grant this right is to affect the world about the rest of us.... Perhaps each of us can, if he wishes, effectively avert the eye and stop the ear. Still, what is commonly read and seen and heard and done intrudes upon us all, wanted or not, for it constitutes our environment.

*Id.* I remain open to the possibility that there may be some acts, communicative or otherwise, that so degrade the essence of human dignity and so denigrate broad notions of societal values that, even in the absence of demonstrable, tangible negative secondary effects, the democratic majority should be capable of curtailing the behavior.

### B. The Chief Justice's Critique of the Historical Approach Is Flawed

¶ 97 After completing her purported plain meaning analysis, Chief Justice Durham asserts that the infirmity of the interpretive approach adopted by the majority and endorsed by this concurrence is illustrated by *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), and *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). The United States Supreme Court wrongly decided these cases, the Chief Justice argues, because it used interpretive techniques similar to those used by the majority—ignoring the text of the Constitution and instead relying "on the law existing at the time of the Constitution's adoption." *Infra* ¶ 135. The Chief Justice asserts that the United States Supreme Court has "long since rejected the notion that practices accepted at the time these provisions were adopted dictate the meaning of the constitutional text." *Infra* ¶ 135.

¶ 98 The results in these cases are indeed troubling and their use in criticizing the majority's interpretive approach warrants some discussion. First, I should note that I disagree with the result in each of these cases.

Second, the interpretive approach relied upon by the majority, what I have called the historical approach, does not advocate that constitutional text be ignored. Rather, the goal of the historical approach is to give effect to the text as understood by those who framed and ratified it. An examination of the text itself is of central importance in achieving that goal.

¶ 99 Third, the historical approach does not provide that practices accepted at the time a provision is adopted should dictate the result. The common law and statutes existing at the time a provision is adopted do not dictate the meaning of any constitutional provision, but they certainly qualify as evidence bearing upon the question I believe must be at the heart of our inquiry—what was the understanding of those who drafted and ratified our constitution? The Chief Justice's characterization of the use of this type of evidence as "pure speculation," *infra* ¶ 136, ignores an important segment of the overall historical picture. There may well be instances where existing-law evidence is overcome by other, more direct evidence of the framers' intent. In this case, however, all evidence of the framers' intent supports, rather than refutes, the majority opinion's interpretation of our constitution.

¶ 100 Finally, in my view, a properly applied historical analysis may well have yielded the opposite result in *Dred Scott* and *Plessy*. Although a searching analysis of these opinions exceeds the scope of this concurrence, it does bear noting that the Supreme Court in these opinions did not, in my view, properly apply the historical approach. A cursory or superficial application of any interpretive approach leads to, at best, suspect results. This is true of the historical approach as well. If a court allows one type of evidence of original intent to dictate its result, it may misconstrue that intent. For instance, there is some indication that the *Plessy* majority either ignored or failed to consider important portions of the historical record. *See* Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 Va. L.Rev. 947, 953 (1995). The result in that case may have been different had they properly applied the approach. *Id.*

¶ 101 Regardless, I do not contend the historical approach to be perfect, but the best of the alternatives. *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L.Rev. 849, 862–63 (1989). It may well be that the historical understanding of the scope of some constitutional right could be incongruent with modern views of what that scope should be. But the mechanism for resolving any such perceived incongruity belongs not to judges but to the people.

*C. Regardless of the Degree to Which the Framers Were Influenced by Natural–Law Concepts, Their Intent Controls the Question of What Constitutes Speech*

¶ 102 In his dissent, Justice Nehring employs the historical approach, accepting the premise that our role in this appeal is to ascertain the intent of the framers and ratifiers of the Utah Constitution regarding the right of free speech. *Infra* ¶ 158. He further agrees that we should do so by examining the constitutional text and historical evidence. *Infra* ¶ 158. His textual and historical examination leads him to the conclusion that the framers and ratifiers were influenced by a natural-law concept of the freedom of speech, rather than a Blackstonian one. A basic assumption running throughout his dissent is that Utah's free speech provisions must be either natural-law based or Blackstonian. In other words, either the constitution only protects against prior restraint (Blackstonian), *see* William Blackstone, 4 *Commentaries* *151–53, or it protects all speech except where it "injur[es] ... any other individual in his person, property, or good name" (natural law), St. George Tucker, *Blackstone's Commentaries: With Notes and References to the Constitution and Laws of the Federal Government of the United States* (1803), *reprinted in,* 5 *The Founders' Constitution* 152–58 (Philip B. Kurland & Ralph Lerner eds., 1987). In my view, the intent of the framers was likely somewhere in between. But even accepting the premise that the framers and ratifiers intended speech to be protected to a degree consistent with a natural-law view, the question remains, what did they consider to be *speech* in the first

instance? Or, as more specifically posed in this appeal, did they intend the right to "communicate freely thoughts and opinions" to extend to nude dancing in sexually oriented businesses? In my view, all of the textual and historical evidence available to us supports the conclusion that they did not.

¶ 103 As Justice Nehring notes, under a natural-law, or Lockean, concept of the right of free speech, the right exists independent of any constitution. A constitution that includes a right of free speech merely *affirms* the existence of such a right; it does not create it. The natural-law view further holds that the right of speech may be restricted by the state only to the extent the speech at issue injures another. Under a Blackstonian view of the free speech right, the right is *created* by the constitution. Further, in the pure Blackstonian view described by Justice Nehring, speech is protected only against prior restraint. Thus, a natural-law concept of the free speech right provides for a much higher measure of protection than does the Blackstonian concept.

¶ 104 Justice Nehring characterizes the majority opinion as adopting a strict Blackstonian construction that protects speech only against prior restraint. I read the majority opinion as protecting speech from both prior restraint and other forms of abridgement or restraint to the extent intended by the framers. There is ample evidence that the free speech right as contained in the Utah Constitution is neither purely Blackstonian nor purely natural-law based. First, the liberty and responsibility clause contains indicia of both the Blackstonian and the natural-law conception of free speech rights. As demonstrated in the majority opinion, the "responsible for the abuse" language has its roots in Blackstone's Commentaries. *Supra* ¶¶ 31–40. But as demonstrated in Justice Nehring's dissent, the "inherent and inalienable right" language has its roots in the natural-law philosophy. Justice Nehring essentially concludes that the natural-law language controls the level of speech protection, but he does not in my view adequately account for the inclusion of the "responsible for the abuse" language. His conclusion begs the question: why did the framers include

indicia of both philosophies if only one has effect?

¶ 105 Second, both the majority and Justice Nehring cite the writings of Thomas M. Cooley to support their position. Justice Nehring characterizes a passage from Cooley's treatise as "a natural rights manifesto." *Infra* ¶ 172. But at least one court has classified Cooley as an adherent to the Blackstonian view. *See State v. Ciancanelli,* 339 Or. 282, 121 P.3d 613, 623–24 & n. 10 (2005). The following passage from Cooley's treatise demonstrates that he does not strictly adhere to either view:

> We understand the liberty of speech and of the press to imply not only liberty to publish, but complete immunity for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established.

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 422 (Leonard W. Levy ed., Da Capo Press 1972) (1868). From this passage, it is clear that Cooley understood freedom of speech to include more than just protection against prior restraint. But it is also clear that he understood the scope of the free speech protection to be influenced by "the common-law rules which were in force when the constitutional guaranties were established." *Id.* In other words, the law existing at the time the constitution was adopted may be used to demonstrate that certain forms of expression were not intended to fall within the protective sphere of the free speech right. Thus, Cooley's conception of the scope of the free speech right was considerably less extensive than the natural-law construction as described by Justice Nehring. In sum, given that the framers of the Utah Constitution included both Blackstonian and natural-law language in the text of the liberty and responsibility clause, and that Cooley took an intermediate position in the debate between the two philosophies, I cannot accept Justice Nehring's assumption that the

free speech right in the constitution is strictly natural-law based.

¶ 106 More importantly, however, even accepting that the framers and ratifiers intended to afford speech a natural-law level of protection, that is, even if they intended to protect all speech not injurious to another, the question remains, what did they consider to be speech? Justice Nehring, like Chief Justice Durham, essentially concludes that all conduct with even a modicum of expressiveness constitutes speech under the Utah Constitution. This conclusion essentially transforms the freedom of speech into a virtually unlimited freedom of conduct and would require the state to satisfy some level of heightened scrutiny for almost every statute or rule that regulates conduct. *See supra* ¶ 92. That the people of this state intended to bind themselves to this extent is highly unlikely.

¶ 107 But even the question of what the framers and ratifiers considered to be speech is broader than the one before us. We need only determine whether they considered the conduct at issue here—nude dancing in sexually oriented businesses—to be speech.[5] All of the textual and historical evidence available to us is consistent with the conclusion that they did not.

¶ 108 Indeed, it seems an unassailable conclusion that the terms "speech" and "communication . . . [of] thoughts and opinions" were not contemplated by those drafting and ratifying the constitution as bestowing any type of protected status on the type of nude dancing at issue in the current case. Any lingering doubt as to whether the citizens of this state desired to protect nude dancing in sexually oriented businesses is completely alleviated by the majority opinion's excellent analysis of the constitutional debate addressing the scope of our state's free speech guarantee, criminal statutes relating to the topic that were in effect both before and after the ratification of the constitution, and the manner in which our sister states have crafted and interpreted their own free speech protections. Moreover, I am unable to discern any mechanism that has since come into operation to now constitutionally protect this type of nude dancing from state regulation. I am therefore unwilling to strike down the ordinance at issue in this case on constitutional grounds, and I concur in the majority opinion.

DURHAM, Chief Justice, concurring in part and dissenting in part:

¶ 109 I respectfully dissent.

¶ 110 The Utah Constitution guarantees the citizens of Utah "the inherent and inalienable right . . . to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1. The proper interpretation of this provision requires that the nude dancing at issue in this appeal be acknowledged as protected communication as a matter of plain meaning. Furthermore, I do not believe that nude dancing performed in private establishments for paying customers constitutes an abuse of the right of free communication. Finally, I find the justifications for the restriction proffered by South Salt Lake both unpersuasive and not in furtherance of a legitimate legislative interest. Accordingly, I would hold the South Salt Lake ordinance to be an unconstitutional restriction of protected speech.

## I. THE SOUTH SALT LAKE ORDINANCE UNCONSTITUTIONALLY RESTRICTS THE RIGHT OF FREE SPEECH GUARANTEED BY THE UTAH CONSTITUTION

¶ 111 The dispute in this case centers on the constitutionality of an ordinance, passed by South Salt Lake (the "Ordinance"), that completely prohibits dancers in private sexually oriented establishments from dancing naked in front of paying customers.[1] South Salt Lake City Mun.Code § 5.56.310 (2005). According to plaintiffs, the Ordinance vio-

---

5. Accordingly, the issue of whether nude dancing in other contexts, such as in the arts, is speech is not before us.

1. The effect of the Ordinance, according to plaintiffs, is to require that the dancers in such establishments perform wearing, at minimum, "pasties" on their breasts and underwear referred to as "G-strings."

lates their right of free speech under the Utah Constitution.[2] The resolution of this issue, and source of my disagreement with both the majority and the concurring opinions, hinges on the proper interpretation of the relevant portions of the Utah Constitution.[3]

¶ 112 The Utah Constitution guarantees its citizens "the inherent and inalienable right ... to communicate freely their thoughts and opinions, being responsible for the abuse of that right."[4] Utah Const. art. I, § 1. In addition, article I, section 15 provides that "[n]o law shall be passed to abridge or restrain the freedom of speech or of the press."[5] Utah Const. art. I, § 15. The task set for this court is to interpret these complementary provisions to determine whether the Ordinance is constitutional. This task requires that we answer two related questions. First, we must determine whether nude dancing is communication that is protected under the liberty and responsibility clause.[6] If we answer this question in the negative, our inquiry is at an end. However,

if we determine that nude dancing is protected communication, we must proceed to the second inquiry: whether South Salt Lake's proffered justifications for the Ordinance are appropriate and whether the Ordinance is "reasonably necessary to further ... a legitimate legislative purpose." *Gallivan v. Walker*, 2002 UT 89, ¶ 42, 54 P.3d 1069.

¶ 113 As these questions deal with the interpretation of the Utah Constitution, their resolution is purely a matter of state law. Federal decisions may provide guidance, however, as we have previously stated that "federal rulings set the floor for federal constitutional protections which we must respect in interpreting the scope of our own constitution's provisions." *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 940 (Utah 1993). With respect to nude dancing, the United States Supreme Court has held that such expression "falls only within the outer ambit of the First Amendment's protection" under the federal Constitution. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion).

2. Plaintiffs also argue that (1) they have suffered an unconstitutional taking at the hands of South Salt Lake because they had a property right in their previous licenses allowing nude dancing; (2) South Salt Lake was without authority to enact the Ordinance; and (3) plaintiff Reid's claims were improperly dismissed. Because I do not quarrel with the reasoning of the majority regarding these issues, *supra* ¶¶ 59–64, I do not address them here.

3. While plaintiffs have directed us to little authority on this issue, as the majority notes, this is likely because little exists. *Supra* ¶ 7. In light of the important constitutional issues raised by this appeal, and the dearth of prior authority, I agree with my colleagues that it is appropriate for this court to fully address the parameters of the free speech rights protected by the Utah Constitution. However, this should not be taken as an invitation to future litigants to simply place issues before us without proper briefing in the hope that we will consider them. *See, e.g., State v. Norris*, 2001 UT 104, ¶ 28, 48 P.3d 872 (noting that we generally will not consider state constitutional claims that are inadequately briefed).

4. The majority generally refers to this clause as the "liberty and responsibility clause." *Supra* ¶ 17. For the sake of clarity, I will do the same.

5. Again, I shall refer to this clause as the "governmental restriction clause," as does the majori-

ty. *Supra* ¶ 7. Article I, section 15 also contains a clause pertaining to criminal libel, which the majority calls the "criminal libel clause." *Supra* ¶ 7. I agree with the majority that this clause is relevant in interpreting the liberty and responsibility clause, as it specifically denotes what the framers considered an "abuse of that right." *Supra* ¶¶ 17–18. The interpretation of this portion of the liberty and responsibility clause is discussed further *infra* at paragraphs 124–28.

6. My colleagues have chosen, I believe in error, to frame this initial issue differently. The majority asks "whether nude dancing is a protected right under the freedom of speech clauses of the Utah Constitution," *supra* ¶ 8, and "if the people of Utah intended to bind the hands of their duly elected officials by protecting nude dancing," *supra* ¶ 15. Similarly, the concurrence asks "whether our state constitution extends protection to nude dancing in sexually oriented businesses." *Supra* ¶ 73. I believe the manner in which both the majority and the concurrence have chosen to frame the issue is designed to presumptively dictate the result both reach, and fails to do justice to the real question before us. Obviously the framers of the Utah Constitution did not draft into that document a right to engage in nude dancing. However, because the clear text of the document protects communication, I believe the relevant initial questions are whether nude dancing is communicative, and whether nude dancing is an abuse of the right to freely communicate.

However, the Utah Constitution, properly interpreted, may provide more protection for free expression and communication rights than the federal Constitution.[7] *See Prune-Yard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). In addition, the decisions of the United States Supreme Court in this area are largely fractured and confusing. Accordingly, I find it appropriate to exercise caution regarding the application of federal decisions; my inquiry here focuses on the pertinent provisions of the Utah Constitution.[8]

### A. Nude Dancing Is Protected Communication under the Plain Language of the Utah Constitution

¶ 114 Our initial task requires that we determine whether nude dancing is constitutionally protected communication. Under the Utah Constitution, citizens have the "inherent and inalienable right ... to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1. I agree with the majority that this clause (the liberty and responsibility clause) should be read in conjunction with the governmental restriction clause, which states: "No law shall be passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. I, § 15. I

also agree with the majority that section 1 *defines* the free speech right, while section 15 *restricts* governmental action regarding the rights contained in section 1. *Supra* ¶ 17.

¶ 115 Because the liberty and responsibility clause defines the nature of free speech rights under the Utah Constitution, I begin my analysis with that clause. In interpreting the Utah Constitution, the starting point should always be the plain meaning of the textual language. *State v. Willis,* 2004 UT 93, ¶ 4, 100 P.3d 1218; *Grand County v. Emery County,* 2002 UT 57, ¶ 29, 52 P.3d 1148. Only if the textual language is ambiguous or unclear should we look outside the words to external sources. *State v. Casey,* 2002 UT 29, ¶ 20, 44 P.3d 756; *Univ. of Utah v. Bd. of Exam'rs,* 4 Utah 2d 408, 295 P.2d 348, 361–62 (1956). As Justice Marshall famously stated, "we must never forget, that it is a constitution we are expounding." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819).

¶ 116 The plain language of the Utah Constitution clearly protects the right to freely communicate. Utah Const. art. I, § 1. The right is expressed in broad, sweeping, and comprehensive terms, with no qualifications placed on the forum, method, or medium of communication.[9] While the Utah Constitu-

---

7. This court has found other protections guaranteed by the Utah Constitution to be broader than similar guarantees under the federal Constitution. *See, e.g., State v. Thompson,* 810 P.2d 415, 417–18, 420 (Utah 1991) (evidence suppressed due to greater privacy expectation in bank and tax records under article I, section 14 of Utah Constitution than under Fourth Amendment to the federal Constitution); *Foote v. Utah Bd. of Pardons,* 808 P.2d 734, 734–35 (Utah 1991) (due to differences in sentencing schemes, article I, section 7 of the Utah Constitution affords greater protected liberty interest than the federal Due Process Clause); *State v. Larocco,* 794 P.2d 460, 469–71 (Utah 1990) (construing article I, section 14 of the Utah Constitution to afford greater privacy interests than the Fourth Amendment to the federal Constitution, thus holding that opening of car door to inspect vehicle identification number constituted unreasonable search); *Malan v. Lewis,* 693 P.2d 661, 670 (Utah 1984) (noting that different language, constitutional contexts, and jurisprudential considerations "may lead to a different result in applying equal protection principles under Article I, § 24 than might be reached under federal law"). While this case presents an issue of first impression in

Utah, other states have interpreted the free speech guarantees of their state constitutions as broader than the protection offered by the federal Constitution. For example, article I, section 8 of the New York Constitution's free speech language has been held to be "broader than the minimum required by the First Amendment." *O'Neill v. Oakgrove Constr., Inc.,* 71 N.Y.S.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277, 281 n. 3 (1988); *see also State v. Henry,* 302 Or. 510, 732 P.2d 9, 11 (1987); *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591, 605 (2002); *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992); *State v. Reece,* 110 Wash.2d 766, 757 P.2d 947, 955 (1988).

8. I exercise the same caution regarding sibling state constitutional decisions, though I do cite them where pertinent to my inquiry regarding the Utah Constitution. *See, e.g., Soc'y of Separationists v. Whitehead,* 870 P.2d 916, 921 n. 6 (Utah 1993) (noting that sister state law may be relied upon when pertinent).

9. The Utah Declaration of Rights in general is written to reflect widely held fundamental principles: "Frequent recurrence to fundamental principles is essential to the security of individual

tion does not define "communicate," it is beyond dispute that the act of communicating extends beyond mere words to encompass a wide variety of expressive activity. *See, e.g., Webster's II New College Dictionary* 227 (1995) (defining "communicate" as "an interchange, as of ideas or information"). In my view, resorting to outside sources is unnecessary to interpret this portion of the Utah Constitution. *See Casey*, 2002 UT 29, ¶ 20, 44 P.3d 756. In contrast to the United States Constitution, the Utah Constitution itself describes and defines the nature of its free speech right.[10] Therefore, the relevant threshold question is whether nude dancing is communicative; if so, it is protected by the plain text of the Utah Constitution unless it is an "abuse of that right." Utah Const. art. I, § 1.

¶ 117 With this framework in mind, I now address whether nude dancing is communicative in nature. In considering this question, I first inquire whether dance in general is a form of expressive activity that is entitled to constitutional protection. If it is, the inquiry then becomes whether dancing done without clothing likewise imparts a particular message that is stifled when nudity is banned.

¶ 118 Dance in general clearly falls within the category of communication and expression protected by the Utah Constitution. "Dance as [e]ntertainment is one of the earliest forms of expression known to man." *Miller v. Civil City of S. Bend*, 904 F.2d 1081, 1085 (7th Cir.1990), *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (split decision). Dance is generally performed for purposes of entertainment, or aesthetic pleasure and appreciation much like music, painting, theater, literature, and sculpture. These forms of entertainment have long been regarded as forms of expressive speech, conveying thoughts, feelings, and ideas.[11] *See, e.g., id.* (describing dance as " 'the art of moving the body in a rhythmical way, usually to music, to express an emotion or idea, to narrate a story, or simply to take delight in the movement itself' " (quoting 16 *The New Encyclopedia Brittanica* 935 (1989))); *see also City of Wichita v. Wallace*, 246 Kan. 253, 788 P.2d 270, 275 (1990) (defining dance as "rhythmic movement ... executed by different parts of the body in accordance with temperament, artistic precepts, and purpose" (internal quotation marks omitted)). In *Miller*, the court stated that dance is in its very essence "the communication of expression," and declined to impose an additional requirement that a dance tell a story or appeal to the intellect in order to receive protection. 904 F.2d at 1086. Therefore, dance in general clearly qualifies as a "communicat[ion] ... [of] thoughts and opinions," entitled to protection under the plain language of the Utah Constitution. Utah Const. art. I, § 1.

¶ 119 Communicative erotic and nude dancing have equally deep historical roots. In *Miller*, Judge Posner noted that "[p]ublic performances of erotic dances debuted in Western culture in the satyr plays of the ancient Greeks ... and ... reappeared in the late nineteenth and early twentieth centuries." 904 F.2d at 1089 (Posner, J., concurring). Modern variations on this dance form include "the can-can and the music-hall chorus line, from which the Folies Bergere and its tame American counterparts—the Ziegfield Follies, and more recently the Radio City Music Hall Rockettes and the chorus lines in Broadway and Hollywood musicals—descend." *Id.* Judge Posner also links the

rights and the perpetuity of free government." Utah Const. art. I, § 27.

10. The court has previously noted that this clause, "by its terms, is somewhat broader than the federal clause." *Provo City Corp. v. Willden*, 768 P.2d 455, 456 n. 2 (Utah 1989).

11. In *Miller v. Civil City of South Bend*, the court gave an excellent discussion concerning the ancient roots of expressive dance. 904 F.2d 1081, 1085 (7th Cir.1990), *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (split decision). For example, the court noted that Aristotle wrote that the purpose of dance is " 'to represent men's character as well as what they do and suffer.' " *Id.* (quoting Aristotle, *Poetics*). Indeed, there is hardly a place or an era in human history or culture in which dance has not been present, important, and powerful as a form of expression. Utah itself has its own native history of dance; members of the Ute tribe have performed the Bear Dance for thousands of years in celebration of the coming of spring and the renewal of life. This tradition was viewed by the world when the dance was performed at the opening ceremony of the Salt Lake City Winter Olympics in 2002.

"Dance of the Seven Veils" in Strauss's *Salome,* mentioned but not analyzed by the majority, to "the fan dancing of Sally Rand and the decorous striptease of Gypsy Rose Lee, or of Gwen Verdon in the musical comedy *Damn Yankees.*" *Id.*

¶ 120 Even modern ballet includes an erotic element, as costumes "became scantier, ... reaching scandalous proportions in Diaghilev's *L'apres midi d'un faune*" in 1912. *Id.* at 1090. Indeed, eroticism has even become "a staple of distinguished companies like the New York City Ballet and the American Ballet Theater." *Id.* Moreover, " '[m]odern dance,' a ballet offshoot pioneered by, among others, the erotic dancer Isadora Duncan, has long been partial to nudity." [12] *Id.* Indeed, contemporary dance companies, including the world-renowned Pilobolus Dance Company, *see* http://www.pilobolus.com, and the Stephen Brown Dance Company, *see* http://www.sbdance.com, have performed in Utah using naked or near-naked performers.

¶ 121 It is beyond debate that the musicals, ballet, and modern dance described above, which often include nude and erotic dancing, are communicative. The dancers in such performances are engaged in an expressive exhibition, the point of which is to entertain the audience; this conduct conveys a variety of messages. Accordingly, such forms of nude and erotic dancing are also communication under the plain language of the Utah Constitution. Utah Const. art. I, § 1. Thus, we come to the question whether the nude dancing at issue in this case, performed at sexually oriented businesses for paying customers, is likewise communicative in nature.

¶ 122 Nude dancing performed at sexually oriented establishments is conceptually indistinguishable from nude dancing performed in musicals, ballet, or modern dance, and therefore is communication within the meaning of the Utah Constitution. Concluding otherwise is to disregard what it is that nude dancing communicates. Like in all commercial dance performances, the nude dancing at issue in this case is performed for entertainment purposes to paying customers. As with the other forms of dance described above, a nude dancer communicates a message to her audience through her movements and appearance. The message of the nude dancing at issue is presumably one of sexuality. Much as the expressive nature of modern dance or ballet would be muted if the dancers were required to wear every-day clothing, the message of the nude dancing at issue is distorted or diminished by banning nudity. In other words, these dancers are simply not able to communicate their message as effectively when they are clothed, however scantily.

¶ 123 The sexual nature of the message conveyed by this particular form of dance is clearly offensive to many. Indeed, a scientific poll is unnecessary to state the obvious—a majority of citizens in this state and this nation disapprove of this form of expression, both because of its explicit messages about sexuality and because of its frequent use and portrayal of women's bodies to communicate those messages. *See, e.g.,* Catherine A. MacKinnon, *Only Words* 71–107 (1993) (proposing that pornography perpetuates inequality between the sexes and harms women). However, the mere fact that nude dancing is offensive or that many people may consider it "low" entertainment does not change the fact that it does communicate a message.[13] To

---

12. This fact reflects the reality that "nakedness is special and is a direct way of marking the specialness of the dancer.... [A]cts of dressing or of undressing may be incorporated into dances with a variety of social, sexual, aesthetic, or other meanings." Francis Sparshott, *Off the Ground* 179 (1988). Since the human body is, after all, the primary means by which a dancer conveys his or her message, it is not surprising that "nakedness is charged with special meanings ... [including] sexuality.... [T]he naked body is, often, the sexually offered and prepared body. Insofar as that is so, naked dance may be inherently erotic." *Id.* at 368.

13. Nor is simple disapproval on moral grounds a sufficient justification to allow regulation of such conduct, a point which is discussed further *infra* at paragraph 145. Justice White gave an excellent analysis of this very issue in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), stating:

The purpose of forbidding people to appear nude in parks, beaches, hot dog stands, and like public places is to protect others from offense. But that could not possibly be the purpose of preventing nude dancing in theaters and barrooms since the viewers are exclusively

hold that nude dancing in sexually oriented establishments is not communicative while nudity in modern dance or ballet is amounts to class and aesthetic elitism.[14] Deciding which forms of expression are of sufficient artistic quality to warrant protection is a particularly difficult and undemocratic task and would be an abuse of judicial authority. Moreover, the mere fact that a message may be of low quality or offensive to some does not change the fact that there *is* a message and that nude dancing is therefore communicative activity. Though the United States Supreme Court has held that nude dancing such as that at issue in this case "falls only within the outer ambit of the First Amendment's protection," it has consistently held that "nude dancing ... *is* expressive conduct." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (emphasis added); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion). If nude dancing is expressive conduct under the federal Constitution, then it is certainly communicative conduct under the broader definition contained in the plain language of the Utah Constitution. If this form of expression is to be restrained, the restriction must be based on something other than

simply declaring that nude dancing is not communication.[15]

¶ 124 The plain text of the Utah Constitution also indicates that the right to freely communicate is constrained by the caveat that Utah's citizens are "responsible for the abuse of that right." Utah Const. art. I, § 1. Thus, I must also consider whether nude dancing is an "abuse of that right." *Id.* In contrast to the first part of the liberty and responsibility clause, this section does not suggest a definition. The plain meaning is not apparent, for on the face of the text anything could be an "abuse of that right." *Id.* Accordingly, it is necessary to move beyond the text to understand the meaning of this language. *See, e.g., Casey*, 2002 UT 29, ¶ 20, 44 P.3d 756 (noting the necessity of external aids when textual language is ambiguous).

¶ 125 The best indication of the meaning of "abuse of that right" is actually found within the text of another clause in the Utah Constitution. In *West v. Thomson Newspapers*, 872 P.2d 999, 1015 (Utah 1994), we noted that in interpreting free speech rights in Utah, article I, section 1 should be read in conjunction with article I, section 15. Section 15 provides that criminal libel is an abuse of the right of free communication, even when the statement is true, unless "published with

---

consenting adults who pay money to see these dances. The purpose of the proscription in these contexts is to protect the viewers from what the State believes is the harmful message that nude dancing communicates.

....

This being the case, it cannot be that the statutory prohibition is unrelated to expressive conduct. Since the State permits the dancers to perform if they wear pasties and G-strings but forbids nude dancing, it is precisely because of the distinctive, expressive content of the nude dancing performances at issue in this case that the State seeks to apply the statutory prohibition. It is only because nude dancing performances may generate emotions and feelings of eroticism and sensuality among the spectators that the State seeks to regulate such expressive activity, apparently on the assumption that creating or emphasizing such thoughts and ideas in the minds of the spectators may lead to increased prostitution and the degradation of women. *But generating thoughts, ideas, and emotions is the essence of communication.*

*Id.* at 590–92, 111 S.Ct. 2456 (White, Marshall, Blackmun, & Stevens, JJ., dissenting) (citations and footnote omitted) (emphasis added).

**14.** It is notable, if regrettable to many, that "[a]s of February 1997, Americans 'spen[t] more money at strip clubs than at Broadway, off-Broadway, regional, and non-profit theaters; than at the opera, the ballet, and jazz and classical music performances—combined.' " Margot Rutman, *Exotic Dancers' Employment Law Regulations*, 8 Temp. Pol. & Civ. Rts. L.Rev. 515, 516 (1999) (quoting Eric Schlosser, *The Business of Pornography: Who's Making the Money?*, U.S. News & World Rep., Feb. 10, 1997, at 44).

**15.** For example, even when conduct is clearly communicative under the plain language of the Utah Constitution, it may still be outside the realm of constitutional protection if it is an "abuse of that right." Utah Const. art. I, § 1; *see infra* ¶¶ 124–28. Moreover, even when conduct is entitled to constitutional protection under the liberty and responsibility clause, it may still be regulated if the regulation is properly justified. *See infra* ¶¶ 141–44.

good motives, and for justifiable ends." [16] Utah Const. art. I, § 15. As noted by the majority, this section contains "[t]he *only* textual evidence" of what "abuse of that right" means. *Supra* ¶ 27 (emphasis added). The majority gives an extensive summary of the debate regarding this clause at the constitutional convention. *Supra* ¶¶ 42–48. The gist of this debate, according to the majority, is that the framers clearly intended to circumscribe the right of free communication by preserving libel doctrine as an exception. *Supra* ¶¶ 42–48. While I disagree with the leaps in logic the majority makes from this debate,[17] the debates certainly demonstrate that the criminal libel clause was intended to function as a limitation on free speech rights, the only limitation apparent from the text of the Utah Constitution.

¶ 126 In *West*, we also found that historical evidence indicates the "abuse of that right" language "was intended to preserve liability for defamation." 872 P.2d at 1015. There, we stated that while defamation actions were preserved, such actions are limited by the governmental restriction clause. *Id.* Reading the liberty and responsibility clause and the governmental restriction clause together, we concluded that free expression "is 'abused' when the opinion states or implies facts that are false or defamatory." *Id.*

¶ 127 The exceptions for defamation and criminal libel provide the only clear indication of what the framers intended by an "abuse of that right." [18] Utah Const. art. I, § 1. However, unlike my colleagues, I do not believe that the nude dancing at issue in this case can be held to be an abuse of the right of free communication based on these clear exceptions. This conclusion, in my view, is clearly counter to the plain text of the Utah

Constitution and the expressed intent of the framers. The framers considered the rights enumerated in the Utah Constitution to be fundamental. 1 Official Report of the Proceedings and Debates of the Convention 200 (Salt Lake City, Star Printing Co. 1898). The plain text indicates that the fundamental right of free communication is constrained only by abuses of that right. Utah Const. art. I, § 1. Therefore, great caution must be taken when construing "abuse of that right," *id.*, to avoid intruding on a fundamental right. Given that the only clear indication of the framers' intent regarding this language is that it apply in a defamation or criminal libel context, I do not believe it proper to extend it by inference and speculation to other forms of communication—particularly under the facts of this case.

¶ 128 I also consider the "abuse of that right" language inapplicable to nude dancing in a private club for a more common sense reason. Defamation and criminal libel doctrine are both premised on the potential for speech or expression that causes harm. *See, e.g., Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988) (stating that a defamatory communication is one that "impeach[es] an individual's honesty, integrity, virtue, or reputation or publish[es] his or her natural defects or expose[s] him or her to public hatred, contempt, or ridicule"). If this court is to go beyond the only constitutionally explicit exceptions to the fundamental right of free communication, this is not the proper case to do it. The nude dancing at issue here, which is performed for paying customers in private, sexually oriented establishments, simply cannot be compared to defamation or criminal libel; there is no indication that this commu-

---

**16.** The majority refers to this provision as the "criminal libel clause." *Supra* ¶ 17.

**17.** The majority ultimately reads the constitutional debate on the criminal libel clause as evidence that the framers wished to limit free speech rights generally. *Supra* ¶ 47. I believe that the majority is vastly off the mark in using the criminal libel clause to justify the restriction at issue in this case, for reasons I discuss *infra* at paragraphs 129–40. It is also noteworthy that this court has previously declared exactly the opposite, noting that the debates generally "reflect[ ]

the positive attitude of the constitution's drafters toward a free and uninhibited press." *West v. Thomson Newspapers*, 872 P.2d 999, 1014 (Utah 1994). This premise is supported by the governmental restriction clause, which is clearly more restrictive of governmental restraints on free speech than its federal counterpart, as noted by the majority. *Supra* ¶ 21.

**18.** As the majority notes, the liberty and responsibility clause gave rise to very little debate at the constitutional convention. *Supra* ¶ 43.

nication is in any way harmful.[19] One can certainly anticipate circumstances in which such conduct could be considered harmful. For example, the fundamental right of free communication does not give a dancer the right to communicate a message of sexuality by performing at the corner of a busy intersection. Not only could such conduct be considered harmful, but there are clearly legitimate state interests which justify regulating such speech. However, the facts before this court do not present any legitimate basis for this court to conclude that the nude dancing at issue here is an abuse of the right of free communication.

¶ 129 Before addressing the second question, whether the Ordinance is justified and is necessary to further legitimate state interests, I believe it necessary to address the interpretive methods used by the majority and the concurrence. In my opinion, neither the majority nor the concurrence gives nearly enough respect to the plain text of the Utah Constitution, resulting in undue restrictions of the fundamental rights at issue here. While both opinions claim to be premised on the text, *supra* ¶¶ 16, 87, the reality is that both do no more than pay lip service to plain meaning interpretation.[20] The result both reach is instead premised on the statutory and common law as it existed at the time the Utah Constitution was adopted. I believe that this approach is inappropriate in this case, for the reasons discussed below.

¶ 130 First, as I have discussed, it is unnecessary to go outside the constitutional text in order to determine whether the conduct at issue is communicative. As discussed *supra* at paragraphs 114–16, the language of the Utah Constitution is broader than that of the federal Constitution and provides a clear definition of free speech. This definition indicates that the free speech right is one of free communication. Therefore, it is not necessary to consult the framers in order to arrive at the proper definition of free speech. Under the definition provided in the text, the first question should always be whether the conduct at issue is communicative. The law as it existed in 1896 is unhelpful and in fact irrelevant to the question of whether nude dancing is communicative in nature, and therefore has no application to this initial question. The question is not whether the framers would have considered the conduct communicative; if it is communicative, that is enough.[21]

¶ 131 Second, I find the methods employed by the majority to be of questionable reliability with respect to the question of whether nude dancing is an abuse of the right of free communication. While the majority admits that the liberty and responsibility clause was not debated at the constitutional convention, it makes much of the debates regarding the criminal libel clause; the concurrence apparently agrees with this approach. *Supra* ¶¶ 42–48, 108. The majority emphasizes the framers' reliance on the common law during the debates regarding the criminal libel clause. *Supra* ¶ 48. From this reliance, the majority concludes that the framers "saw the common law as establishing the boundaries of the freedom of speech," *supra* ¶ 48, and

---

19. While South Salt Lake makes much of the supposed "secondary effects" of nude dancing, there is no evidence in the record to indicate such problems are actually occurring. Absent such evidence, I find no basis for concluding that nude dancing is an abuse of the fundamental right of free communication. Nor do I believe that the evidence presented by South Salt Lake justifies its burdening of the speech rights at issue, as discussed *infra* at paragraphs 145–55.

20. Interestingly, both the majority and the concurrence adopt an extremely "liberal" interpretive approach to reach a traditionally conservative result. It is noteworthy that such an approach is the only way to reach the result both arrive at, for a conservative interpretive approach would dictate the result I reach instead.

21. The concurrence seems to believe otherwise, stating that "the terms [of the liberty and responsibility clause] were not contemplated by those drafting and ratifying the constitution as bestowing any type of protected status on ... nude dancing." *Supra* ¶ 108. This approach ignores not only the concurrence's proffered reliance on the text as the starting point in constitutional interpretation, *supra* ¶ 87, but also the constitutional debates' failure to indicate that the framers considered bestowing protection on *any* particular form of communication. Rather, the most that can be culled from the debates is that the framers intended to place defamation and criminal libel *outside* the realm of free speech protection. *Supra* ¶¶ 42–48.

that we must likewise rely on the common law "in order to discern the outer limits of the freedom of speech," *supra* ¶ 49. Much of the remainder of the majority's opinion, also adopted by the concurrence, is taken up with an examination of the statutory and common law existing at the time the Utah Constitution was adopted. *Supra* ¶¶ 49–58.

¶ 132 Such extrapolation is a remarkably unreliable method of interpreting the liberty and responsibility clause. It is true that we have, at times, looked to the common law to help interpret a constitutional provision. *See, e.g., West*, 872 P.2d at 1013 n. 24 ("When construing a constitutional provision, a court may consult common law principles."). However, the majority takes the framers' reliance on the common law in debating the proper content of the *criminal libel clause*, and assumes that the framers viewed the common law as setting the parameters of free speech rights *generally*. *Supra* ¶ 49. Such an extrapolation of the specific to the general is simply wrong. The criminal libel clause functions only as a specifically defined *exception* to free speech rights,[22] not as the outer boundaries of the right of free speech itself. That the framers relied on the common law in debating this very specific exception does not indicate that *all* free speech rights should likewise be defined by the common law. The majority's assumption is particularly disturbing because the unambiguous text itself provides the only definition of free speech rights, a definition that is very broad. Utah Const. art. I, § 1. Nor does such reliance indicate that the framers intended the then-existing law to establish all abuses of the right of free communication. It would certainly have been a simple task for the framers to note that it was an "abuse of that right" to violate all then-existing restrictions on communication. *Id.* This the framers did not do. Rather, the only clear indications of the framers' view of "abuse of that right" demonstrate that the phrase applies to defamation and criminal libel. Absent clearer evidence than the mere state of the law in 1896, I find it inappropriate to read the entire law then existing into the Utah Constitution.

¶ 133 Furthermore, I believe that the point of relying on history and the common law in interpreting our constitution is to inform our result, not dictate it. Such an approach is meant to provide background to the pertinent constitutional provision, but should not define it unless there are clear indicia that this is what was intended. I trust that this court would be loathe to allow the common and statutory law existing in 1896 to dictate our interpretation of the Utah Constitution in other situations. For example, article IV, section 1 guarantees that "[b]oth male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges." Utah Const. art. IV, § 1. Yet, at the time of the Utah Constitution's adoption, women were prohibited from serving as jurors. Laws of Utah ch. 52, § 1 (1896). However, I do not believe that this court would interpret the constitution to allow such discrimination, tolerable in 1896, to exist today. Likewise, as the majority notes, *supra* ¶ 55, around the time our constitution was enacted women were prohibited from earning money by dancing in public at all—clothed or naked. Utah Rev. Stat. § 4244 (1898). Were South Salt Lake to enact an ordinance to this effect today, I do not believe that the Utah Constitution could be interpreted to allow such a severe restriction on communicative activity.

22. In addition, it should be noted that we recently cast doubt on the constitutionality of the criminal libel clause. *See I.M.L. v. State*, 2002 UT 110, ¶ 23, 61 P.3d 1038. There, we stated, "In *Garrison*, the United States Supreme Court considered the truth and 'good motives' defense and found it merely palliative." *Id.* (citing *Garrison v. Louisiana*, 379 U.S. 64, 70–73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). We continued:

By requiring a showing of "good motives" and "justifiable ends," this provision [of the Utah Constitution] allows the punishment of truthful statements made with less than pure intent. As the *Garrison* court recognized, free speech cannot be limited by the motives of the speaker: "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred." Thus, this section of the Utah Constitution fails to bring the statute [under consideration in *I.M.L.*] within the prescribed bounds of the First Amendment.

*Id.* (quoting *Garrison*, 379 U.S. at 73, 85 S.Ct. 209).

¶ 134 The concurrence goes to great lengths to establish the superiority of a "textual" approach to constitutional interpretation, *supra* ¶¶ 83–86, noting that it is "dangerous" to engage in subjective decision-making, for "a determined and creative judge can expand the term 'speech' or 'communicate' to include virtually any aspect of human conduct," *supra* ¶ 81. However, the approach adopted by both the majority and the concurrence is no less dangerous, for it allows a judge to *restrict* the meaning of constitutional text to only the law existing at the time of enactment.[23] This method of interpretation is uniquely suited for turning prejudices into constitutional doctrine, a lesson the United States Supreme Court has learned when using similar interpretive techniques.

¶ 135 For example, in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), the Court confronted the inherent conflict between the equality stated in the text of the Constitution and the practice of slavery. Ignoring the text, the Court upheld slavery based on the law existing at the time of the Constitution's adoption. *Id.* at 404–12. Similarly, in *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the Court upheld "separate but equal" facilities, despite the Fourteenth Amendment's clear language of equality, because the practice was condoned at the time of the Amendment's adoption. *Id.* at 544–49, 16 S.Ct. 1138. Yet the Court has long since rejected the notion that practices accepted at the time these provisions were adopted dictate the meaning of the constitutional text.[24] *See, e.g., Brown v. Bd. of Educ.*, 347 U.S. 483,

495–96, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (overruling *Plessy* ).

¶ 136 The lesson from these cases is equally pertinent here. To hold that the free speech provisions of the Utah Constitution mean only what they did in 1896 risks the creation of constitutional doctrine that eviscerates the fundamental right to "freely communicate." Utah Const. art. I, § 1. The concurrence argues that "it seems an unassailable conclusion" that the framers did not contemplate the free speech right as including nude dancing. *Supra* ¶ 108. Yet, the concurrence also concedes that "the intent of those who drafted our constitution is difficult to discern." *Supra* ¶ 85. This is certainly true with regard to the liberty and responsibility clause. There is simply *no* indication of the framers' intent save the plain language of the free speech definition and the two exceptions discussed above. To read any other restriction on this fundamental right into the constitution is pure speculation, always a dangerous task.

¶ 137 Moreover, this court should not substitute contradictory then-existing law for the drafters' own clear statement of higher governing principles. Writing for the ages makes it particularly difficult—if not impossible—to enact constitutional principles founded on prejudice or inequality. This is certainly true with regard to the Utah Constitution, for despite contradictory then-existing law, the framers drafted a clear, expansive definition of free speech. If we are to respect the text of their choosing, as both the majority and the concurrence suggest we should, we should not allow inconsistent and contradictory law from 1896 to trump the

---

23. I agree that the text should always be the touchstone of constitutional interpretation. However, the approach of both the majority and the concurrence is itself divorced from the text, as both read in then-existing law that is not only outside the text but was never mentioned by the drafters.

24. Justice Stevens gave a particularly astute observation regarding the method of interpretation relied on by the majority and concurrence, stating:

> The contrary evidence cited ... only underscores the obvious fact that leaders who have drafted and voted for a text are eminently capable of violating their own rules. The first

Congress was—just as the present Congress is—capable of passing unconstitutional legislation.... To adopt such an interpretative approach would misguidedly give authoritative weight to the fact that the Congress that passed the Fourteenth Amendment also enacted laws that tolerated segregation, and the fact that the Congress that passed the First Amendment also enacted laws, such as the Alien and Sedition Act, that indisputably violate our present understanding of the First Amendment.

*Van Orden v. Perry*, 545 U.S. 677, —— n. 27, 125 S.Ct. 2854, 2885 n. 27, 162 L.Ed.2d 607 (2005) (citation omitted) (Stevens & Ginsburg, JJ., dissenting).

principles actually adopted by the framers. Frederick Douglass explained this principle well in his landmark speech delivered in Glasgow, Scotland, on March 26, 1860. In that speech, Douglass stated:

> [I]t should be borne in mind that the mere text, and *only* the text, and not any commentaries or creeds written by those who wished to give the text a meaning apart from its plain reading, was adopted as the Constitution of the United States. . . . [T]he intentions of [the Framers], be they good or bad, for slavery or against slavery, are to be respected so far, and so far only, as will find those intentions plainly stated in the Constitution. It would be the wildest of absurdities, and lead to endless confusion and mischiefs, if, instead of looking to the written paper itself, for its meaning, it were attempted to make us search it out, in the secret motives, and dishonest intentions, of some of the men who took part in writing it. *It was what they said that was adopted by the people, not what they were afraid or ashamed to say, and really omitted to say.*

2 *Life and Writings of Frederick Douglass* 467–80 (Philip S. Foner ed., 1950), *quoted in* Paul Brest & Sanford Levinson, *Processes of Constitutional Decisionmaking: Cases and Materials* 207 (3d ed., 1992) (emphasis added). I believe that Douglass' reasoning is applicable here. The bottom line is that our constitution clearly and unambiguously protects the right to freely communicate, even if the message communicated is offensive.

¶ 138 The Oregon Supreme Court recently decided a strikingly analogous free expression case under its state constitution, which is similar to Utah's. There, the court considered a statute that made it a crime to " 'direct, manage, finance, or present' a 'live public show' in which the participants engage in sexual conduct." *State v. Ciancanelli,* 339 Or. 282, 121 P.3d 613, 614–15 (2005) (quoting Or.Rev.Stat. § 167.062). Presented with the same argument made in this case by the majority and the concurrence, the court found the statute facially unconstitutional, stating:

> [T]he words [of the Oregon Constitution] are so clear and sweeping that we think that we would not be keeping faith with the framers who wrote them if we were to qualify or water them down, unless the historical record demonstrated clearly that the framers meant something other than what they said. . . . [W]e have found no such demonstration. Thus, it appears to us beyond reasonable dispute that the protection extends to the kinds of expression that a majority of citizens in many communities would dislike—profanity, blasphemy, pornography—and even to physical acts, such as nude dancing or other explicit sexual conduct, that have an expressive component.

*Id.* at 311, 121 P.3d 613.

¶ 139 Finally, the majority's description of the history of free speech rights, *supra* ¶¶ 31–40, is similarly unpersuasive. The majority argues that, because the phrase "responsible for the abuse" has a "history of preserving the power of the state to regulate speech under certain historical exceptions," the framers implicitly adopted these exceptions. *Supra* ¶ 40. The majority traces these historical exceptions back to Blackstone's *Commentaries,* which stated that it was not a violation of free speech for the government to punish " 'blasphemous, immoral, treasonable, schismatical, seditious, or scandalous libels.' " [25] *Supra* ¶ 32 (quoting William Blackstone, 4 *Commentaries* *151–53).

¶ 140 The majority's reliance on Blackstone's beliefs regarding free speech rights is misplaced. Blackstone's view of the common law reflects English doctrine, which has been rejected in this country for centuries. For example, the First Amendment has long been understood to embody the privilege to criticize the government, a principle which is fundamental in a true democracy. *See, e.g., Lee v. Weisman,* 505 U.S. 577, 626, 112 S.Ct.

---

**25.** Schism is defined as "[a] separation into factions, [especially] a formal division within a Christian church[,] [or] [t]he offense of attempting to produce a schism." *Webster's II New College Dictionary* 987 (1995). Blackstone's view

that the common law permits punishment of schismatic speech is quite obviously inconsistent with the American view of freedom of religion, for American governments have never policed

2649, 120 L.Ed.2d 467 (1992) ("If the early Congress's political actions [in passing the Alien and Sedition Acts] were determinative, and not merely relevant, evidence of constitutional meaning, we would have to gut our current First Amendment doctrine to make room for political censorship."); *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665–66, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (referring to seditious libel as "this universally renounced, and long-defunct, doctrine"); *Ciancanelli*, 121 P.3d at 624 n. 11 ("Blackstone believed that it was consistent with the common law notion of freedom of the press to punish even an entirely truthful attack on a public figure, because the sovereign could determine that such a publication would have an undesirable 'tendency' to disturb the public peace." (citation omitted)). I do not believe that the Utah Constitution took the extraordinary step of silently reinventing politically motivated libel—or adopting other supposed "exceptions"—in the phrase "being responsible for the abuse of that right." Utah Const. art. I, § 1. Again, there is no concrete support for the majority's argument; the fact that the constitutional language is traceable to Blackstone is no indication that the framers adopted his views, particularly when those views were so out of harmony with American law and tradition.[26] The history cited by the majority is simply not demonstrative of free speech rights under the Utah Constitution, particularly given the absolute lack of any indication the drafters relied on any such history.

### B. *The South Salt Lake Ordinance Is not Necessary to Further a Legitimate Legislative Interest*

¶ 141 Because I conclude that nude dancing is protected communication under the Utah Constitution, I reach the question of whether the Ordinance unjustifiably burdens protected speech. The Utah Constitution states that "[n]o law shall be passed to abridge or restrain the freedom of speech." Utah Const. art. I, § 15. However, freedom of speech is not an absolute right. Even when communicative conduct falls within the protections guaranteed by the Utah Constitution, regulatory action is permissible if it is properly justified. The issue thus becomes whether the restraint of free speech rights in this case is an *unconstitutional* restraint.

¶ 142 The determination of this issue turns on the proper standard of review. As an initial matter, legislative enactments are generally presumed constitutional, *Greenwood v. City of N. Salt Lake*, 817 P.2d 816, 819 (Utah 1991), unless a "significant constitutional right is claimed to have been abrogated by a statute," *Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 43, 67 P.3d 436 (Durham, C.J., dissenting). As discussed above, I believe the Ordinance clearly intrudes upon free speech rights in this case. Accordingly, the legislative presumption is inapplicable here.

¶ 143 When constitutional rights under article I are at issue, we have "consistently applied various forms of heightened review." *Wood*, 2002 UT 134, ¶ 43, 67 P.3d 436 (Durham, C.J., dissenting). For example, in *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989), we stated that heightened analysis requires a "real and thoughtful examination of legislative purpose and the relationship between the legislation and that purpose." *Id.* at 356. Similarly, in *Lee v. Gaufin*, 867 P.2d 572 (Utah 1993), we stated that legislation intruding upon article I's open courts clause is constitutional only if it "(1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal." *Id.* at 583. "In other words, in order for a discriminatory classification to be constitutional it must be reasonably necessary to further, and in fact must actually and substantially further, a legitimate legislative purpose." *Gallivan v. Walker*, 2002 UT 89, ¶ 42, 54 P.3d 1069 (citing *Lee*, 867 P.2d at 582–83).

---

church members to prevent dissent or dissidence.

**26.** Justice Nehring's concurring and dissenting opinion, in my view, ably identifies the historical tension between the Blackstonian and natural law views of freedom of expression, and properly describes the Utah Constitution's origins regarding the latter tradition. *Infra* ¶¶ 165–90.

¶ 144 Because the Ordinance restricts free speech under article I of the Utah Constitution, I would likewise subject it to heightened scrutiny.[27] Under this standard, I believe that there are two questions of fundamental importance. First, whether the objectives proffered by South Salt Lake are legitimate. Second, whether the Ordinance is reasonably necessary to further a legitimate objective, and whether it actually does so. The burden with respect to these elements is on South Salt Lake.

¶ 145 South Salt Lake has specifically cited the promotion of "morals" as one of the purposes of the ordinance under review. In my view, nude dancing cannot legitimately be prohibited simply because a majority of South Salt Lake's citizenry disapproves of the message being sent. As discussed *supra* at paragraph 123, I have no doubt that the message imparted by nude dancing is distasteful to many. However, expression cannot be forbidden simply because it is unpopular. In the federal realm, it has long been the law that censorship may not be based on culturally relative senses of decency or public morals. *See, e.g., Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210–11, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (striking down law prohibiting nudity in drive-in movie theaters). When expression is restricted on such grounds, the Court has held that citizens can "protect [their] own sensibilities 'simply by averting [their] eyes.' " *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (quoting *Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). This is certainly true with respect to the nude dancing at issue in this case, which is viewed only by consenting, paying customers in private establishments. I believe that the censorship of nude dancing based on the fact that the message of sexuality is offensive to the morals of South Salt Lake is equally

impermissible under the Utah Constitution. "The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly." *Id.* at 826, 120 S.Ct. 1878.

¶ 146 The other justifications offered by South Salt Lake in support of the Ordinance amount to a host of "deleterious secondary effects" that are alleged to result from nude dancing. Most prominently, these include high crime, property devaluation, the spread of sexually transmitted diseases, and urban blight. That the prevention of such secondary effects is a legitimate legislative interest seems beyond dispute. *See, e.g., Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48–49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (discussing use of zoning ordinances to combat secondary effects of sexually oriented establishments). However, the relevant question is not whether South Salt Lake is entitled to prevent urban blight; it may clearly do so. The more important question is whether South Salt Lake has established that the Ordinance is *necessary* to prevent these supposed secondary effects, and whether the Ordinance *actually* does so. *Gallivan,* 2002 UT 89, ¶ 42, 54 P.3d 1069.

¶ 147 In considering this issue, I do not believe that South Salt Lake is required to prove a causal connection between the Ordinance and the harm that it seeks to prevent to the degree that would be required in a court of law—such a burden of proof would unduly interfere with the responsibility of legislative bodies to govern even in the absence of clear scientific knowledge. However, South Salt Lake is still responsible for upholding constitutional values, including free speech rights. If South Salt Lake wishes to "abridge or restrain" free speech, Utah Const. art. I, § 15, it must establish that it has carefully considered and appropri-

---

27. Justice Nehring's opinion critiques this analysis for failing to account for the nuances that might be permitted by "time, place, and manner" restrictions, narrowly drawn. *Infra* ¶¶ 197–98. His opinion describes dancing as content and "nude" as manner of execution. *Infra* ¶ 198. My point, however, is that nudity in nude dancing is often an integral element of the expression itself—part of the content, and not separable. *Supra* ¶ 122. Regulating sculpture according to the kind of materials used would burden the expressive process rather than qualifying as a "time, place, or manner" restriction; while erotic dance may certainly be restricted to private spaces and to venues where public offense or harm will be avoided, I do not believe that the prescription of how the dancer's body is to be clothed is merely a "manner" restriction.

ately weighed the constitutionally protected rights at issue, and has crafted a remedy designed to invade them as little as possible while producing a real benefit.

¶ 148 On the record before us, it is impossible to meaningfully assess whether naked dancing in sexually oriented businesses is related to the "deleterious secondary effects" that South Salt Lake seeks to prevent through the ordinance under review. A close reading of the record reveals that South Salt Lake supports its position with (1) four minor convictions related to plaintiffs' businesses—convictions reversed and remanded by the Utah Court of Appeals for possible due process violations due to lack of notice;[28] (2) conclusory affidavits from city council members stating that they "had an opportunity to review and be familiar with the volume of materials provided by the City Staff in consideration of ordinance 2001–04 prior to the adoption of the ordinance"; and (3) studies from secondary sources. However, no evidence of actual secondary effects, let alone a causal link between such effects and the absence of pasties and G-strings, appears in the record.[29] While South Salt Lake contends that "sexually oriented businesses require special supervision from the public safety agencies of the City in order to protect and preserve the health, safety, morals and welfare of the patrons of such businesses as well as the citizens of the City," South Salt Lake City, Utah, Mun.Code § 5.56.310 (2005), it does not explain why a curtailment of expression is necessary in light of the utter lack of evidence of increased crime, decreased property values, or the spread of sexual diseases attributable to plaintiffs' businesses.[30]

¶ 149 Furthermore, South Salt Lake's reliance on secondary sources to justify the Ordinance is unpersuasive. These sources provide absolutely no indication that the Ordinance at issue is preventing any secondary effects because they do not demonstrate that such secondary effects even exist in South Salt Lake. Because the use of such sources is becoming increasingly prevalent in this type of litigation in light of recent federal decisions, I examine the federal cases briefly here.

¶ 150 While the United States Supreme Court has long held that secondary effects related to sexually oriented businesses justify time, place, and manner restrictions in the form of zoning ordinances, *see Renton*, 475 U.S. at 46–51, 106 S.Ct. 925, it recently expanded the secondary effects doctrine drastically. In *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (*Pap's I* ), the Court held that municipalities may rely on studies from other cities that have examined the secondary effects of adult entertainment businesses without having to conduct research in their own communities. *Id.* at 296, 120 S.Ct. 1382. With respect to the expansion of that doctrine in *Pap's I*, it has been noted that

---

**28.** The court of appeals noted that, rather than using the video surveillance available at the clubs, "the officers elected to participate in the private sessions themselves, instigating contact between Defendants and themselves, and then citing Defendants for allowing the contact." *S. Salt Lake City v. Terkelson*, 2002 UT App 405, ¶ 2, 61 P.3d 282.

**29.** It should be noted that the city has other regulations available, which have not been challenged, pertaining to any legitimate secondary effects. *See, e.g.*, South Salt Lake City Code § 5.56.060 (providing zoning restrictions); *id.* § 5.56.120 (setting hours of operation).

**30.** Moreover, plaintiffs presented evidence that these supposed deleterious secondary effects do not even exist. Hallard Connor, the president of plaintiff American Bush, states in an affidavit submitted to the trial court that the assessed value of his building increased from $258,000 to $434,000 between 1996 and 2000. Also, in a letter to the South Salt Lake City Council, plaintiffs' attorney states that to the best of his knowledge no dancer at any of these establishments has ever tested positive for a sexually transmitted disease on mandatory, twice-yearly tests. The attorney also claims that, in response to a vice officer's complaint several years ago to American Bush that he could not enter the premises unobserved, the officer was given a backdoor key and the alarm code. Accordingly, plaintiffs have raised material issues of fact as to whether any "deleterious secondary effects" actually exist to be remedied. Thus, at a minimum, this case should be remanded to the trial court so that a meaningful inquiry might be made regarding South Salt Lake's claims of harmful secondary effects caused by the naked dancing at these clubs.

[application of the secondary effects doctrine] absolve[s] municipalities of any responsibility to provide an evidentiary basis for their justifications. At the same time, it allows the most irrational remedial means to be coupled with those secondary effects—even if they are both far-fetched and unlikely to have any real impact. In combination, the Court has given municipalities carte blanche to create a secondary effects fiction on both ends of the spectrum—justification and means.

Christopher Thomas Leahy, Comment, *The First Amendment Gone Awry: City of Erie v. Pap's A.M., Ailing Analytical Structures, and the Suppression of Protected Expression,* 150 U. Pa. L.Rev. 1021, 1074 (2002); *see also* Paul Bryant et al., *Government Regulation of "Adult" Businesses Through Zoning and Anti–Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects,* 6 Comm. L. & Pol'y 355, 389 (2001) (questioning applicability of secondary effects doctrine).

¶ 151 The holding of the *Pap's I* Court does more than simply decrease the evidentiary burden for municipalities to restrict free expression. In that case, the Court also found the secondary effects doctrine justified a statute that required dancers to wear pasties and G-strings, just as the South Salt Lake Ordinance does. *Pap's I,* 529 U.S. at 301–02, 120 S.Ct. 1382. Thus, the Court went far beyond mere zoning ordinances and allowed restriction of the expression actually occurring inside the businesses. Justice Stevens, joined by Justice Ginsburg, expressed strong criticism of the Court's holding, opening his dissent with the statement:

Far more important than the question whether nude dancing is entitled to the protection of the First Amendment are the dramatic changes in legal doctrine that the Court endorses today. Until now, the "secondary effects" of commercial enterprises featuring indecent entertainment have justified only the regulation of their location. [N]ow ... such effects may justify the total suppression of protected speech.

*Pap's I,* 529 U.S. at 317–18, 120 S.Ct. 1382 (Stevens, J., dissenting). After discussing a study performed by the city of Seattle which examined the effectiveness of zoning controls in minimizing the secondary effects of adult theaters, Justice Stevens stated that "if [*Pap's I*] is relying on the Seattle study ..., its use of that study is most peculiar," in that neither that study nor any other "suggest[s] that the adverse secondary effects of commercial enterprises featuring erotic dancing depends *in the slightest* on the precise costume warn [sic] by the performers—*it merely assumes it to be so.*" [31] *Id.* at 321 n. 4, 120 S.Ct. 1382 (emphasis added).

¶ 152 South Salt Lake likewise assumes that requiring dancers in sexually oriented establishments to wear pasties and G-strings will reduce these supposed "secondary effects." This assumption seems to be premised on the hypocrisy engendered by the *Pap's I* approach, based on the following admission by David Carlson, an attorney for South Salt Lake:

Studies have shown communities with such clubs have higher crime rates and the businesses often serve as fronts for prostitution and have a negative impact on property values, he said.

*Carlson is not suggesting South Salt Lake has these problems.* However, he said, the U.S. Supreme Court has ruled in previous cases that the city can rely on studies done elsewhere to mitigate such problems.

In what can most delicately be characterized as an enormous understatement, the plurality concedes that "requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects." To believe that the mandatory addition of pasties and a G-string will have *any* kind of noticeable impact on secondary effects requires nothing short of a titanic surrender to the implausible.
*Id.* at 323 (citation omitted).

---

**31.** Justice Stevens went on to state:
[The Court] compounds [its] error [in approving a total ban on naked dancing] by dramatically reducing the degree to which the State's interest must be furthered by the restriction imposed on speech, and by ignoring the critical difference between secondary effects caused by speech and the incidental effects on speech that may be caused by a regulation of conduct.

Angie Welling, *South S.L. to Cite Nude Clubs*, Deseret News, June 22, 2002, at 133 (emphasis added). There is thus an apparent contradiction between what the city has said in the "Purpose" section of the Ordinance (the alleged "deleterious secondary effects" it seeks to control) and what its attorney is quoted as saying—that it seeks to "mitigate" effects it has not actually experienced. I believe this contradiction exists because the *Pap's I* decision has sent the worst of mixed signals to municipalities across the country: Constitutionally protected expression is subject to meaningless and ineffective regulation, based only on the government's articulation of the correct legal mantra. I see no reason to follow such an approach under the Utah Constitution.

¶ 153 In my view, the standard under the Utah Constitution requires South Salt Lake to support its total prohibition on nude dancing with more than secondary sources. South Salt Lake has utterly failed to demonstrate that any "deleterious secondary effects" are actually occurring as a result of nude dancing. Thus, it has failed to show that the Ordinance is even reasonably necessary to combat *anything*. Moreover, South Salt Lake has not established that requiring dancers in private sexually oriented establishments to wear pasties and G-strings actually prevents any of the problems the Ordinance is supposedly designed to remedy. Therefore, South Salt Lake has not met the second prong of the heightened scrutiny standard.

¶ 154 The result I reach is consistent with the decisions of other state courts that have considered this issue under similarly worded state constitutional provisions. For example, following remand, the Pennsylvania Supreme Court recently considered whether the ordinance analyzed by the *Pap's I* Court violated the free expression provisions of its state constitution. *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 593 (2002) (*Pap's II*). As with article I, section 1 of the Utah Constitution, the relevant section of Pennsylvania's constitution specifically guarantees the right of "free communication of thoughts and opinions." Pa. Const. art. 1, § 7. The ordinance at issue in *Pap's II* was also strikingly similar, requiring the "dancers, at a minimum, to cover themselves with what are commonly known as 'pasties' and a 'G-string.'"[32] *Id.* at 594. The *Pap's II* court struck down the ordinance as an unconstitutional infringement of free speech protected by the Pennsylvania Constitution. *Id.* at 613. The court noted that "[i]t is hardly onerous to require that a regulation that would seek to govern such expression, offered in a closed establishment to consenting adult patrons, be accomplished by a narrower, less intrusive method than the total ban on expression adopted here." *Id.* at 612.

¶ 155 Similarly, the Massachusetts Supreme Court recently held that a local indecency statute banning nude dancing in a private business was unconstitutional under the free speech clause of the Massachusetts Constitution. *Mendoza v. Licensing Bd. of Fall River*, 444 Mass. 188, 827 N.E.2d 180, 189 (2005). The court held the statute unconstitutional when examined under either a strict or an intermediate level of scrutiny. *Id.* The court stated, "The ordinance ... completely prohibits a constitutionally protected form of expressive conduct within the city limits.... [It] is tantamount to censorship of such protected expression. No matter what the formulation of the test, such a complete ban is not 'narrowly tailored,' and is unconstitutional on that ground." *Id.* Other state supreme courts have reached similar results when considering similar statutes.[33]

---

**32.** The proffered justifications were also nearly identical to those offered by South Salt Lake. The *Pap's II* ordinance stated that the council wished to "limit[] a recent increase in nude live entertainment within the City, which activity adversely impacts and threatens to impact the public health, safety and welfare by providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleteri-

ous effects." *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 594 (2002).

**33.** *See also Mickens v. City of Kodiak*, 640 P.2d 818, 822 (Alaska 1982) (holding unconstitutional an ordinance prohibiting nudity in establishments serving alcohol because no compelling reasons exist to prohibit free expression based on the content of the expression); *Harris v. Entm't Sys. Inc.*, 259 Ga. 701, 386 S.E.2d 140, 142 (1989) (holding that an ordinance prohibiting

¶ 156 In conclusion, I find that the Ordinance operates as a clear restriction of free speech rights protected by the Utah Constitution. South Salt Lake has not demonstrated the necessity of this restriction, nor has it shown that the Ordinance actually furthers any of its proffered objectives. Accordingly, I would strike down the Ordinance as an unconstitutional restriction of free expression.

NEHRING, Justice, dissenting:

¶ 157 I respectfully dissent from categorically consigning nude dancing to the realm of expression outside the protective reach of the Utah Constitution. Unlike Chief Justice Durham, however, I do not conclude that the South Salt Lake City ordinance is unconstitutional. I would, instead, remand the matter to the district court for evaluation under the analytical model applicable to assessing the regulation of speech under the First Amendment to the United States Constitution.

¶ 158 I part company with both the majority and the dissent on one of the few points upon which they agree: that the liberty and responsibility clause of article I, section 1 of the Utah Constitution is complementary to the governmental restriction clause of article I, section 15. I find these constitutional provisions to be related by topic—expression—but little else. These two provisions have separate and distinct historical lineages. The textual and historical evidence leads me to conclude that whatever the men who drafted the Utah Constitution intended these provisions to mean was something quite different from what the majority hypothesizes. My alternative reading of the intent of the framers and ratifiers—the third interpretation offered by this court in this case—uses the same tools, the examination of text and historical evidence, employed by the majority

and the dissent and endorsed by Justice Durrant in his concurrence.

¶ 159 I begin with the constitutional text. Article I, section 1 states:

All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

Utah Const. art. I, § 1. The text of article I, section 15 reads:

No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Utah Const. art. I, § 15.

¶ 160 Both the majority and Chief Justice Durham read these provisions to describe the same complement of rights respecting speech and expression. Accordingly, they presume that the rights conferred by the liberty and responsibility clause are coextensive with those placed beyond the power of government to abridge or restrain in section 15.

¶ 161 To be sure, there is intrinsic appeal to imposing symmetry on constitutional guarantees that appear to protect similar rights. The notion that the rights reserved to "all men" by the liberty and responsibility clause are the same rights placed beyond the power of the state to regulate under the governmental restriction clause can also be defend-

---

certain nude conduct where alcohol is served "is an unconstitutional exercise of police powers even under the less stringent content-neutral test"); *Bellanca v. N.Y. State Liquor Auth.*, 54 N.Y.2d 228, 445 N.Y.S.2d 87, 429 N.E.2d 765, 768 (1981) (holding that a ban on all topless dancing in premises licensed to sell liquor is unconstitutional under the state constitution because the New York Constitution does not contain a provision "modifying the State guarantee

of freedom of expression corresponding to . . . the diminishing effect of the Twenty-first Amendment with respect to the Federal guarantee of freedom of expression"). *But see City of Bangor v. Diva's, Inc.*, 830 A.2d 898, 908 (Me.2003) (local ordinance prohibiting nude entertainment where liquor is served held constitutional because the Maine Constitution's free speech rights do not "prohibit[ ] the exclusion of nudity based solely on the on-premises sale of alcohol").

ed as the necessary result of applying the rule of construction that promotes the goal of a harmonious, internally consistent interpretation of statutory and constitutional texts. As we have said in the context of statutory interpretation, "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." *State v. Maestas,* 2002 UT 123, ¶ 54, 63 P.3d 621 (internal quotation marks omitted).

¶ 162 To the majority, achieving a seamless tie between article I, section 1 and article I, section 15 takes on great importance, because it emboldens the majority to take on the otherwise perilous task of explaining what it means to be "responsible for the abuse of" the expressive rights recognized in section 1. As the majority correctly notes, the "responsibility" component of the liberty and responsibility clause occupies a place in our constitution unsupported by any explanatory language. Our interpretive confidence does not extend, then, beyond concluding that the "responsibility" clause tethers the "liberty" element of article I, section 1. The challenge that confronts us is to determine what an abuse of the right to communicate thoughts and opinions is and what sanctions, if any, *accompany responsibility for abuses of that right.*

¶ 163 The majority first attempts to surmount this challenge by examining other sections of the Declaration of Rights. It reasons, quite plausibly, that the text of article I, section 15 might lend interpretive assistance to the liberty and responsibility clause. As it happens, article I, section 15 is constructed in a manner similar to article I, section 1. Just as the liberty and responsibility provision of article I, section 1 begins with a broad statement of rights reserved to "all men," the first sentence of article I, section 15 imposes on the government broad restrictions on its ability to regulate speech. Then, just as article I, section 1 follows its "liberty" clause with the limiting "responsibility" language, article 1, section 15 qualifies the restrictions on governmental regulation with an

exception that reserves to the government the right to proscribe by statute the offense of criminal libel. This parallel structure, although likely coincidental, provides a means for the majority to explain how the responsibility clause might be applied. Its interpretive theory may be described this way: The expressive rights granted by the government in article I, section 1 are the same expressive rights that the government may not abridge or restrain under the terms of article I, section 15. If article I, section 15 expressly permits the government to enact criminal libel statutes—and, moreover, criminal libel statutes that do not permit truth to provide a defense—the government should likewise be able to define abuses of the right to communicate thoughts and opinions using the model of criminal libel as a guide to what constitutes an abuse.

¶ 164 The majority must successfully defend its premise that the rights described in article I, section 1 and article I, section 15 are identical in order to generate persuasive force behind its conclusion that nude dancing is not protected expression. This is because the majority must make the case that the Blackstonian view that government has broad authority to regulate speech applies to both article I, section 1 and article I, section 15. I believe that the text of article I, section 1 and the historical context of that text leads instead to the conclusion that the liberty and responsibility provision of article I, section 1 is not written in the hand of William Blackstone nor closely linked to the speech restriction clause of article I, section 15. Accordingly, I cannot endorse the majority's assertion that the drafters and ratifiers of the constitution intended the "responsibility" clause to invite broad governmental power to restrict expression deemed to be immoral.

¶ 165 William Blackstone's *Commentaries on the Laws of England* plays a preeminent role in making the majority's historical case. Blackstone advanced a doctrine of speech freedom that the majority characterizes as "conservative." The *Commentaries* adopted the view that freedom of speech and press barred prior restraint of speech, but little else. The majority contrasted Blackstone's

conservative interpretation with the "liberal" approach, which reached its high watermark in the Revolutionary era. This "liberal" view of free expression was one that provided protection for expression generally. Under the "liberal" interpretation, expression was considerably more difficult to "abuse."

¶ 166 The majority traced the formulation of free speech provisions in state constitutions and noted a trend throughout the first half of the nineteenth century to include "responsibility" clauses qualifying their free speech protections. According to the majority, by the time the Utah Constitution was drafted, Blackstone had triumphed. Expression was free from prior restraint, but little else.

¶ 167 I would have little difficulty accepting the majority's conclusion that Blackstone could count Utah's as a constitution in which his views of the freedom of speech held sway if article I, section 15 were the sole provision addressing freedom of speech and press in our constitution. But it is not, and the presence of article I, section 1 complicates the analysis of constitutional expressive rights and calls into question Blackstone's claim to doctrinal primacy.

¶ 168 Article I, section 1 articulates rights that government cannot confer upon its citizens. Instead, its rights are "inherent and inalienable." The language used to describe these rights is the language of natural rights.

¶ 169 The natural law language of "inherent and inalienable rights" can be traced to the political philosophy of John Locke and provided much of the intellectual rationale for the American Revolution. *See State v. Ciancanelli,* 339 Or. 282, 121 P.3d 613, 624 (2005) (discussing natural law influences on free speech protections in constitutions of western states). As the majority notes in its account of the history of the nation's understanding of the freedom of speech, early state constitutions incorporated broadly worded guarantees of that right. In the natural law tradition, speech was fully shielded from governmental restraint. This was not to say, however, that speech was subject to no constraints whatsoever. The limit of speech was at the point where it inflicted injury to "any other individual in his person, property, or good name." *Id.* at 622–23.

¶ 170 As the eighteenth century ended, however, states began to add the "responsibility" element to what had up to then been a freedom of speech formulation that featured only the "liberty" element. The majority interprets this trend as marking the resurgence of the Blackstonian approach to free speech and a tipping of the balance toward the authority of government to regulate "blasphemous, immoral, treasonable, schismatical, seditious, or scandalous libels." William Blackstone, 4 *Commentaries* *151–53. The case for this proposition is most convincingly made where constitutional provisions do not cloak their protections of speech in natural rights language. *See Ciancanelli,* 121 P.3d at 628 (noting that the omission of pronouncements that any rights guaranteed by the Oregon Constitution were "inalienable" was the source of controversy). The intention to incorporate the Blackstonian view of free speech is less evident where "responsibility" language appears within a constitutional provision, like article I, section 1, that expressly describes the right to free speech as "inherent and inalienable."

¶ 171 Much of the evidence that the drafters of the Utah Constitution intended article I, section 1 to embrace natural law can be found in the very sources cited by the majority. Prominent among these is the lengthy quotation from Thomas M. Cooley's treatise, which the majority cites as an authoritative philosophical guide for the work of the delegates at the constitutional convention. The passage from Cooley bears repeating here:

> In considering State constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed.... [A state constitution] is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people,

but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of the laws, rights, habits, and modes of thought. There is nothing primitive in it: it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny.

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 36–37 (Leonard W. Levy ed., Da Capo Press 1972) (1868).

¶ 172 The majority reads this philosophical proclamation to bolster its theme that "[t]he framers of Utah's constitution saw the will of the people as the source of constitutional limitations upon our state government." *Supra* ¶ 13. I do not comprehend how this passage can be read for this proposition. From start to finish, the Cooley quotation is a natural rights manifesto.

¶ 173 A state constitution is a product of the will of the people, as are the restrictions on governmental power to curtail individual rights that a state constitution may impose. Cooley makes clear, however, that in his opinion state constitutions do not create individual rights. Those rights have origins in sources apart from the will of the people as expressed in state constitutions. If Cooley were, in fact, as influential as the majority suggests, his teachings would have neutralized, even vanquished, impulses to embrace Blackstonian notions of free speech.

¶ 174 The majority's quotation from Cooley has appeared in our cases before, as have the prefatory remarks to it made by Charles Varian, the acting president of the Constitutional Convention. Justice Durham, writing for the two justices of this court who reached the question of whether Utah's constitution permitted imposition of the death penalty for the crime of aggravated assault by a prisoner, found that the comments of Mr. Varian had "articulated the understanding of the members of the convention that Utah's Declaration of Rights was never meant to establish a comprehensive or positive law but merely to reaffirm various natural rights that exist independent of any constitution." *State v. Gardner*, 947 P.2d 630, 636 (Utah 1997).

¶ 175 Thus, while it would be improper for us to invoke the murky, ill-defined body of law termed natural rights to overturn contemporary legislation, it is proper for us to consider the role of natural law in the formulation of our constitution. As Justice Durham stated in *Gardner*, "we are free, and in fact our duty requires us, to interpret existing constitutional language to the best of our ability in conformity with the meaning of that language as we understand it and as we conceive the framers meant it to be understood." *Id.* at 637. This includes honoring, where appropriate, the natural law influences found in the Declaration of Rights.

¶ 176 The difficulty inherent in divining the intent of the drafters of state constitutions is revealed in the struggle that marked the Texas Supreme Court's attempt to interpret that state's constitutional protection of free expression in *Ex parte Tucci*, 859 S.W.2d 1 (Tex.1993), a case the majority leans on heavily to support its Blackstonian thesis. The majority points to Texas Supreme Court Chief Justice Phillips's concurring opinion as evidence that Texas has allied itself with the expansive authority of government to regulate speech favored by Blackstone. Chief Justice Phillips's views on this subject were roundly criticized in an appendix to the *Tucci* opinion styled, "Response to Concurrence of Chief Justice Phillips" penned by the plurality. The response questioned his central assertion that the drafters of the Texas Constitution were content to dilute free speech protections by authorizing Blackstonian governmental intrusions on speech. As one of many jabs at the reasoning and historical accuracy of the concurrence, the *Tucci* plurality states that "Chief Justice Phillips amazingly concludes that these people [citizens of the Republic of Texas] who so prized freedom and individualism, lacked 'tolerance' of expression." *Id.* at 31 n. 25.

¶ 177 The *Tucci* plurality also squarely rejects Chief Justice Phillips's contention that the expressive freedoms secured by the Texas Constitution were dependent upon and defined by the Texas Constitution's governmental restriction clause. The plurality reiterated its approval of the court's earlier historical assessment that "[r]ather than a restriction on governmental interference with speech such as that provided by the First Amendment of the United States Constitution, Texans chose from the beginning to assure the liberties for which they were struggling with a specific guarantee of an affirmative right to speak." *Id.* at 31 (internal quotation marks omitted).

¶ 178 To the extent that the lessons of *Tucci* can be transferred to Utah, they would support the proposition that the affirmative recognition of an inherent and inalienable right to communicate thoughts and opinions contained in article I, section 1 affords the citizens of Utah rights of expression superior to and independent from the restrictions placed on government to limit free speech in article I, section 15.

¶ 179 While a natural law reading of article I, section 1 is incompatible with a Blackstonian interpretation of the "responsibility" clause, the concept of limits to free expression is consistent with natural law. As I noted above, natural law recognized that a speaker may be held to account for injury to "person, property, or good name." The remedy for those injured by abuses of the right to communicate thoughts and opinions is not found in an exception to the governmental restriction clause of article I, section 15, but rather in the guarantees articulated in article I, section 11. The relevant portion of this provision, commonly known as the "open courts" clause, states, "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law." Utah Const. art. I, § 11. This language closely tracks St. George Tucker's description of the limits of a non-Blackstonian, natural law based right of expression as injury to an individual "in his person, property, or good name." *Ciancanelli*, 121 P.3d at 622–23.

¶ 180 The close conceptual and textual connection between a natural law interpretation of article I, section 1 and the open courts clause reinforces the natural law credentials of the liberty and responsibility clause by providing a constitutional point of reference to help understand what an abuse of the expressive right is and what can be done about it. The majority claims that the only textual evidence for the "responsibility" element of the liberty and responsibility clause appears in article I, section 15's criminal libel provision. This assertion requires a conceptual leap of some distance, a span that is significantly broadened when the liberty and responsibility clause is reunited with its natural law heritage. The open courts clause presents a much better interpretive "fit" for the responsibility element of the liberty and responsibility clause by expressly inviting persons aggrieved by an alleged abuse of article I, section 1's expressive right to pursue relief in the courts.

¶ 181 A natural law interpretation of the liberty and responsibility clause necessarily requires an answer to the question, "Where does article I, section 15 'fit'?" Once again, part of the answer appears in the majority opinion. In her discussion of the proceedings of the constitutional convention, Justice Parrish implies, correctly in my view, that the delegates had newspapers in the forefront of their minds during the debate over the text of article I, section 15. This is evident from the particular interest the Utah Press Association and the editor of *The Salt Lake Tribune*, Charles Goodwin, had in the formulation of the provision's language, particularly that relating to criminal libel. The world of newspaper publishing was much different in 1895 than it is today. The most profound evidence of this difference is in the number of newspapers published. At the turn of the century, an inhabitant of Utah could choose from 580 newspapers staffed by more than 1,200 editors and publishers. *West v. Thomson Newspapers*, 872 P.2d 999, 1013 n. 25 (Utah 1994). We took note of the rough and tumble press environment of the statehood era in *Thomson*, 872 P.2d at 1013–14. It was a time of unrestrained opinion mongering. The marketplace of ideas was a

teeming souk, overflowing with merchandise of dubious quality. In this respect, the information landscape had much in common with the blogosphere of our day. As we observed in *Thomson*, the press environment of the time focused the attention of the convention on the treatment of libel in article I, section 15. That discussion was conducted in the language of positive law with no overtones of natural law. It yielded a free speech clause in which the prohibition on the enactment of laws abridging speech is seemingly overshadowed by the lengthy, detailed description of the criminal libel exception to that prohibition.

¶ 182 I believe that it would be wrong to use the criminal libel language within article I, section 15 to justify governmental restrictions on speech generally. By 1895, Utah's debate over the wording of a criminal libel component of its constitution was a common, perhaps obligatory, item on the agenda of state constitutional conventions. A canvass of the constitutions of the fifty states shows that thirty-four expressly address criminal libel. Criminal libel proved to be a persistent presence on the free speech landscape, reaching back in time to the 1735 trial of Peter Zenger and continuing through the prosecution of James Callender for violation of the Alien and Sedition Act, *United States v. Callender*, 65 Whart. St. Tr. 688, 25 F.Cas. 239 (C.C.D.Va.1800), a case that led to the impeachment of Supreme Court Justice Samuel Chase in 1805, and enduring into nineteenth century state constitutional debates until finally declared unconstitutional under the First Amendment in *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Provisions recognizing the lawfulness of criminal libel were commonplace in nineteenth century state constitutions; for example, article I, section 8 of the Texas Constitution reads as follows:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8.

¶ 183 Yet, there is little evidence that a state's treatment of criminal libel in its constitution was intended to serve double duty as an endorsement of a broad Blackstonian grant of legislative supremacy in the arena of free expression.

¶ 184 If the text of article I, section 1 and the debates over the criminal libel language in article I, section 15 at Utah's constitutional convention do not reflect allegiance to Blackstone, would this alter our analysis of the South Salt Lake City ordinance? I believe that it should. To understand why I hold this view, it is necessary to briefly examine the methodology the majority selected to reach its determination that nude dancing was not intended to be protected by the Utah Constitution.

¶ 185 The majority ceded sweeping authority to the legislature to define the scope of free speech in 1895 by concluding that the free expression elements of the Utah Constitution are Blackstonian. By deciding that the constitutional scope of free expression is determined by the legislature through its enactments, or defined by the common law, the task of excluding nude dancing from constitutional protection was substantially eased.

¶ 186 I am uncomfortable with this approach for several reasons. First, as I have discussed above, I do not believe that the case has been made that the people responsible for drafting and ratifying the Utah Constitution intended to constitutionalize every territorial statute based on the theory that the legislature had broad discretion to rein in the form and content of expression. Furthermore, the approach adopted by the majority does not explain how or why a particular territorial statute should be taken into account when assessing its constitutional implications.

¶ 187 An examination of the statutes cited by the majority to establish the unprotected status of nude dancing will illustrate this problem. The first Utah legislature reenacted a territorial statute that made it a crime to "employ any female to dance, promenade, or otherwise exhibit herself" in any "saloon, dance cellar, or dance room, public garden, public highway, or in any place whatsoever, theaters excepted." *Supra* ¶ 55 (citing Utah Rev. Stat. § 4244 (1898)). This injunction certainly restricts who may dance. It is far less clear that it is intended to restrict expression.

¶ 188 While the statute bans women from dancing in public, it does not forbid men to impersonate women in dances, promenades, or other exhibitions. I make no claim to any historical knowledge about drag entertainment in Utah at the time of statehood. If it existed, it is safe to assume it was not encouraged. Whether entertainers in drag performed in Utah is not the point. It is rather that by criminalizing female dancing the legislature may not have intended to target content, but had in mind the preservation of the nineteenth century's gender-based morality.

¶ 189 A companion statute to the ban on female dancing makes this point even more compellingly. Territorial law exposed a woman who played any musical instrument "for hire, drink, or gain ... in any drinking saloon, dance room or dance cellar, public garden, or any public highway, common, or street, or on a vessel, steamboat, or railroad car, or in any lewd house, or disorderly place whatsoever, where two or more persons are assembled together" to a $100 fine and one month in jail. Utah Rev. Stat. § 4243 (1898). This statute was no more about music than the companion prohibition on female dancing was about dancing. Through both of these enactments the State exercised its police power to regulate gender roles, not expression. The legislature's concern was with the messenger, not the message.

¶ 190 No member of this court would, I believe, take seriously a contention that any of the statutory proscriptions against women playing musical instruments do not enjoy constitutional protection and may be banned today, irrespective of whether the statutes were aimed at unpopular content or intended to combat perceived harm to women. But the majority does not explain how we would conduct a principled review that would take us to this obvious result. The musical instrument ban was in place as early as 1876 and reenacted after statehood. Yet, clearly, more than a long-standing territorial statute or the statute's reenactment after statehood is required to establish the intention to deprive a form of expression of constitutional protection. The majority does not tell us what that requirement is, other than to say that there existed enough historical evidence to satisfy the majority that nude dancing would have been considered unacceptable and therefore is not entitled to constitutional protection.

¶ 191 Also left unresolved in the majority's approach is the fate of nude dancing performed in settings other than in sexually oriented businesses. By branding all nude dancing as expression unprotected by the Utah Constitution, the majority has seemingly cut itself off from shielding nudity in modern dance or ballet from governmental intrusion. Accordingly, I agree with Chief Justice Durham's critique of the majority opinion's shortcomings in this respect.

¶ 192 I believe that it is unfortunate that the majority has chosen to disregard the fact that the ordinance restricts its application to sexually oriented businesses in favor of a sweeping and, in my opinion, flawed analysis that follows this syllogism: obscene speech was not entitled to constitutional protection in 1895, nude dancing is obscenity, therefore nude dancing enjoys no constitutional protection.

¶ 193 I do not believe that the majority is prepared to adopt the position that any territorial statute that prohibited a form of expression and survived to become part of the laws of the State of Utah denies constitutional protection to that expression. The absence of clear evidence that the Utah Constitution absorbed Blackstonian doctrine into its text makes it even more difficult to deem the statutory and common law treatment of certain forms of expression categorically ineligible for constitutional protection.

¶ 194 I reach my conclusion, therefore, that the text and history of article I, section 1 and article I, section 15 manifest the intention of the framers to protect the expansive rights of expression inherent to every person, independent of governmental intrusions justified by Blackstonian philosophy or by extrapolation from the criminal libel provisions of article I, section 15. I am therefore convinced that the majority is wrong in concluding that the men who drafted and ratified the Utah Constitution intended the "responsibility for abuse" provision to empower the government to restrict "immoral" speech.

¶ 195 Although I join the Chief Justice in concluding that nude dancing falls within the protections afforded expression by the Utah Constitution, I do not join in either her conclusion that the South Salt Lake City ordinance is unconstitutional or her method of assessing whether the ordinance unjustifiably burdens expression.

¶ 196 Having rejected the majority's conclusion that nude dancing is entitled to no protection whatsoever under the Utah Constitution, the Chief Justice advocates a test of constitutionality that, in my view, would impose too demanding a burden on South Salt Lake City.

¶ 197 Despite indicating that we have applied "various forms" of heightened scrutiny to alleged infringements of article I rights, the Chief Justice nevertheless appears to advance a "one size fits all" standard of heightened scrutiny to restrictions on the right of free expression that is borrowed from our article I, section 11 "open courts" jurisprudence. That approach places exclusive focus on the nature of the legislative objective and the propriety of the means selected by the legislative body to reach that objective. It is, therefore, an approach that appears to treat all forms of expression to the same high degree of constitutional protection. Nor does the Chief Justice's preferred analytical model appear to acknowledge that a separate approach might be in order for "time, place, and manner" restrictions of the type fashioned by South Salt Lake City.

¶ 198 The absence of nuance in the Chief Justice's analytical model is evident in her summary dismissal of "morals" as a legitimate justification for the ordinance. Her citation to federal authorities for the proposition that expression cannot be forbidden simply because it offends the moral sensibilities of a majority of citizens is both true and misleading. The cases that announce that principle dealt with enactments that directly targeted expressive content. *See, e.g., United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). The South Salt Lake City ordinance is not directed at content, but is rather a time, place, and manner restriction that seeks to regulate the manner—minimal clothing—in which persons may appear, whether engaged in expressive activity or otherwise, within a sexually oriented business.

¶ 199 Therefore, just as I believe the majority's analysis falls short of the mark by its silence on the question of how it would treat nude dancing in legitimate theater, I find the Chief Justice's approach unsatisfying in her unwillingness to consider content in any way whatsoever when deciding how high to set the bar that South Salt Lake City must clear to justify the legitimacy of its ordinance.

¶ 200 If there is one other matter upon which the majority and the Chief Justice are in accord, it is in their dissatisfaction with federal First Amendment jurisprudence. I am far less troubled by it. In fact, I have come away from this appeal with a newfound sympathy for it. The attraction of the federal First Amendment approach may have more to do with my unease over the alternatives proposed by my colleagues. The majority offers too little protection for expression, while the Chief Justice is overprotective. I have, therefore, come to be convinced that there is merit in the federal "intermediate scrutiny" model and that we should incorporate it into our analytical approach to the regulation of free expression under the Utah Constitution.

¶ 201 The Chief Justice is particularly critical of federal "secondary effects" jurisprudence. Under the current formulation of the doctrine, adequate "secondary effect" justifi-

cations for restrictions on speech may be derived from *pro forma,* secondary evidence of harmful effects of sexually oriented expression. While I share the Chief Justice's concern that intermediate scrutiny may slide into the realm of no scrutiny at all, I agree with the hopeful observation of the Tenth Circuit Court of Appeals that "the quantity and nature of the empirical evidence needed to uphold a city ordinance based on the negative secondary effects of sexually oriented speech in general, or nude dancing in particular, are continuing to evolve." *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1197 (10th Cir.2003).

¶ 202 I would reverse the trial court and remand this matter for review under the federal First Amendment model. I am mindful that the outcome of such a remand might be preordained. The South Salt Lake City ordinance has already endured and survived a First Amendment challenge in a federal court action brought by dancers employed by the businesses that are the plaintiffs here. I would, nevertheless, give the business plaintiffs their day in court.